UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALBERT CRAIG,                                        **COMPLAINT**
                                     Plaintiff,

                                                     **JURY TRIAL DEMANDED**

              -against-

THE CITY OF NEW YORK, (NYC)
ELIAS HUSAMUDEEN,
NYC DEPARTMENT OF CORRECTIONS
COMMISSIONER  CYNTHIA BRANN,
MARIA GUCCIONE EXECUTIVE DIRECTOR
OF LABOR RELATIONS AT
NYC DEPARTMENT OF CORRECTIONS,
and DEPUTY WARDEN DESIREE HILL,
                                     Defendants.
-------------------------------------------------------------x
              Plaintiff, by his attorney, Fred Lichtmacher of The Law Office of Fred

Lichtmacher P.C., complaining of the Defendants herein, respectfully alleges as follows:

### JURISDICTION AND VENUE

1.       Jurisdiction is founded upon the existence of a Federal Question.

2.       This is an action to redress the deprivation under color of statute, ordinance, regulation,

custom, or usage of  rights, privileges, and immunities secured to the Plaintiff by the First and

Fourteenth Amendments to to the Constitution of the United States pursuant to 42 U.S.C. § 1983

and an award of attorney's fees is appropriate pursuant to 42 U.S.C. § 1988.

3.       Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(a) (3, & 4).

4.       Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in the Eastern District of New York

because events forming the basis of the Complaint occurred in this District.

### PARTIES

5.       Plaintiff ALBERT CRAIG was at all times relevant  a NYC Department of Corrections

(hereinafter DOC) Officer and as of 2013 he has also been a duly elected member of the Executive Board (hereinafter the Executive Board or the Board) of the Corrections Officers Benevolent Association, (hereinafter COBA) which meets in Queens New York.

6.      Defendant CITY OF NEW YORK (hereinafter NYC) is a Municipal Corporation within New York State.

7.      Pursuant to its Charter, NYC has established and maintains the DOC as a constituent department or agency.

8.      At all times relevant, NYC employed the parties to this lawsuit.

9.      Defendant ELIAS HUSAMUDEEN is a DOC officer and the President of COBA and he is sued herein in his capacity as an individual and none of the allegations herein brought against him are attributed to COBA, but rather to ELIAS HUSAMUDEEN acting as an individual outside of his authority as President of COBA, and without the permission of the COBA Board.

10.     Defendant DOC COMMISSIONER  CYNTHIA BRANN, at all times relevant was a duly appointed employee of the DOC and she is liable in her official capacity as the final decision maker for the DOC, as well as in her capacity as an individual, for directly participating in the acts described herein, as well as for her role in supervising and in failing to supervise the individual Defendants named herein.

11.     Defendant MARIA GUCCIONE EXECUTIVE DIRECTOR OF LABOR RELATIONS, at all times relevant was a duly appointed employee of the DOC, and she is sued herein in her capacity as an individual.

12.     Defendant DEPUTY WARDEN DESIREE HILL at all times relevant was a duly appointed employee of the DOC and she is sued herein in her individual capacity.

## FACTS UNDERLYING
## PLAINTIFF'S CLAIMS FOR RELIEF

**THE PLANNED SALE OF RIKERS ISLAND**

13.     Defendant NYC has decided to sell Rikers Island, a property that without the jails located on it, upon information and belief, is worth in excess of Thirty Billion Dollars.

14.     The average daily inmate population at Rikers Island, until recently, was about 10,000, although Rikers can hold a maximum of 15,000 inmates.

15.     Currently, the inmate population at Rikers is down to approximately 5,000 inmates for the reasons set forth herein.

16.     The NYC Council voted in October of 2019 to close NYC's Rikers Island jail complex by 2026, allegedly due to chronic violence and decrepit facilities, as well as due to the nation's changing position on mass incarceration; these alleged motivations for the closing of Rikers are pretexts.

17.     The underlying motivation to close Rikers is far different than the published purpose, about which the public has been wrongfully informed.

18.     The true motivation behind the closing of Rikers is the desire to profit from the sale of the multi billion dollar property, and in an effort to further that end, Plaintiff, stands as impediment to the Defendants' plans.

19.     NYC plans to replace the Rikers facility with four existing structures, facilities located in Brooklyn, Manhattan, Queens and the Bronx.

20.     These four buildings have a combined capacity capable of housing far fewer inmates than the Rikers Complex.

21.     In order to effect its plan to close the Rikers jail facilities, NYC has to do two things: 1) it must release inmates held at Rikers Island, and 2) it must decrease the number of DOC employees working in the prisons, in particular correction officers.

22.     One way this is being done, is by terminating correction officers improperly and another is by releasing inmates, who unfortunately have not been fully vetted as to their violent tendencies.

23.     Upon information and belief, in the new fiscal year NYC is planning to lessen by 648 the number of people employed by the DOC.

24.     In his role as a member of COBA's Executive Board, Mr. Craig has an interest and obligation, in not allowing correction officers to be improperly terminated.

25.     Further, NYC has intentionally been under reporting, not properly addressing, and not properly investigating, incidents of inmate on inmate violence as well as inmate on officer violence, and once again Albert Craig has an interest as a member of COBA's Executive Board in addressing the violence at Rikers.

26.     Mr. Craig has been speaking for years to the Board of Corrections concerning the problem of violence at Rikers.

27.     If NYC were to accurately report and address the violence on Rikers Island, freeing the needed number of prisoners to justify closing Rikers would be more difficult.

28.     If NYC were to accurately investigate incidents involving correction officers more objectively, it would be more difficult, for the DOC to shed from its payroll the number of officers NYC needs removed to implement the planned sale of Rikers.

29.     As a consequence of NYC's plan and its method of implementation, NYC may well be

-4-

subjecting NYC residents to an increase in violent people walking the streets; subjecting the DOC officers to more frequent terminations without justification; subjecting the DOC officers to more acts of violence against them; and subjecting inmates to abuse by other violent inmates who are not being properly identified, disciplined and segregated.

30.     It is important to note that most of Rikers inmates have not been convicted of any crimes and are awaiting trial, and to the extent they are being subjected to violent inmates who have not been identified as such and segregated, they are innocent victims of NYC's plan.

31.     Because he is the president of COBA, Mr. Husamudeen's cooperation with NYC is essential to implement the planned sale of Rikers.

32.     For his part, Mr. Husamudeen has been intentionally looking the other way at NYC's inappropriate policies and in return, NYC has looked the other way at suspicious activities in which Mr. Husamudeen has engaged.

33.     Additionally, during the current pandemic, NYC and Defendant Brann have been ruthlessly acting not in the interest of protecting the inmates and officers, but in the interest of guaranteeing the conditions they claim exist at Rikers continue to exist and are exacerbated, and these acts have cost DOC members and inmates, their health and in some instances, their lives.

34.     Mr. Craig has spoken to outside agencies, including The Bronx District Attorney, the New York State Attorney General, the Board of Charities, the Board of Corrections, various NYC and NYS politicians and the NY Times about Mr. Husamudeen's possibly corrupt activities and NYC's less than savory activities which are matters of grave public concern, and after exercising his right to free and protected speech, Mr. Craig has been retaliated against and harmed by the Defendants acting both individually and collectively.

35.     Reporting corruption to outside agencies is not part of Mr. Craig\s job as a correction officer or as a member of the Executive Board.

**THE COBA ATTORNEYS**

36.     Steven Isaac is General Counsel for COBA, and he is the managing partner of Koehler. and Isaac.

37.     Marc Steier is the Director of Legal Services for COBA and he is the liason between Koehler and Isaac and COBA's Executive Board.

38.     Nathaniel Charny was hired by the Executive Board of COBA to fight several lawsuits and to retrieve funds from the Platinum Partners, in <u>Romain vs Seabrook</u>.

39.     Vincent O'Hara is the attorney who manages the COBA Annuity Fund.

**THE CHRONOLOGY**

40.     In his role as a member of the Executive Board Mr. Craig has made complaints both internally, and stepping outside of the obligations of his role with the Board, he has made complaints to outside agencies, about actions taken by Defendant Mr. Husamudeen he believes to be both and improper and illegal, and his complaints to outside agencies have resulted in contemporaneous and severe retaliation against him.

41.     Mr. Craig has observed first hand questionable practices regarding finances engaged in by the President of COBA, Defendant Elias Husamudeen.

42.     Mr. Craig has observed and complained about Mr. Husamudeen spending money without informing the Executive Board of what he was spending COBA Union Members' Funds on.

43.     Plaintiff observed and complained about Mr. Husamudeen giving frivolous awards to high ranking members of the DOC, in 2017 and 2018, acts which do not forward any interest of

the rank and file, and Mr. Husamudeen overruled the Executive Board which had ruled against handing out such awards, resulting in an expense incurred by the COBA Union Members' Fund.

44.     In 2019 Mr. Husamudeen had spoken out about high profile assaults on officers and he called for Commissioner Brann's termination and in response, Defendant Commissioner Brann banned him from attending the correction officers graduation, making him look weak in the eyes of the rank and file and jeopardizing his reelection.

45.     Mr. Husamudeen then began catering to Defendant Brann's wishes, even when they were not in the best interest of the rank and file, and in return, she reneged and allowed him to attend the graduation and she looked the other way at Mr. Husamudeen's questionable activities.

46.     To remain in Commissioner Brann's good graces, Mr. Husamudeen frequently stopped advocating for the rank and file of COBA, which included but which is not limited to frequently failing to address necessary measures to physically protect the officers as well as to protect their jobs.

47.     Currently the DOC under Commissioner Brann has been using the same people to investigate alleged correction officer violence as the people it allocates to administer possible discipline to said officers, and Mr. Husamudeen is doing nothing to stop this inherently not fair or objective procedure, which easily allows the DOC to inappropriately discipline and/or terminate officers.

48.     For close to a year, one of the inappropriate procedures employed by the DOC has been to suspend officers without pay before investigations into their alleged actions are even completed.

49.     On December 20, 2018 Plaintiff emailed COBA's treasurer accusing Mr. Husamudeen of spending money without permission from the Executive Board and without informing the Board

of what he was spending the COBA Union Members' funds on.

50.     Additionally, Mr. Craig expressed fear he was going to be retaliated against by Mr. Husamudeen for speaking out about Mr. Husamudeen's improper activities.

51.     The spending of these funds without Executive Board approval is an activity which violates COBA's bylaws, and was an act that Mr. Husamudeen testified Norman Seabrook had committed at Mr. Seabrook's criminal trial[1].

52.     Because the Plaintiff had been incessantly complaining about Mr. Husamudeen acting without Board approval, he began actively ostracizing Mr. Craig from his role as an Executive Board member.

53.     Mr. Husamudeen began limiting Mr. Craig to speaking no more than five minutes at meetings, and Mr. Craig was entirely prevented from speaking out about officer safety.

54.     On January 13, 2019 Mr. Husamudeen, notified the Board members a vote would be taken to retrieve annuity funds in the amount of six million dollars from Murray Hubberfeld of Platinum Partners who was involved in the Norman Seabrook scandal.

55.     Later on January 13 between 3-3:10pm, there was a conference call with the Board members on the telephone organized by Mr. Husamudeen for the purpose of verbally approving the resolution to accept the six million dollars settlement; even though verbal confirmation of resolutions violates COBA's bylaws and even though the correct amount of the Hubberfeld settlement it turned out was to be seven million not six million dollars.

56.     Attorney Vincent O'Hara wrote the resolution.

---

[1]     The Plaintiff assumes the Court is aware of the criminal case against Norman Seabrook the former president of COBA.

57.     On January 24, 2019 at a Board meeting at which Mr. O'Hara was present, the physical copy of the resolution was passed around to the Board members which erroneously indicated there was a six million dollar not seven million dollar settlement with Hubberfield.

58.     At first, Board members were signing the resolution without looking at it, but when it was presented to Board Member Angel Castro, he noticed the discrepancy in the amount and he, Mr. Craig and others on the Board refused to sign.

59.     Upon information and belief, at no time have a majority of the Board members signed off on resolving the claim against Hubberfield for six million dollars and the disposition of the money has not been reported to the Executive Board.

60.     When Mr. Husamudeen was aggressively questioned about the one million dollar discrepancy, he requested the lawyer for the Annuity Fund Mr. O'Hara write a new resolution, but that resolution for a seven million dollars settlement appears to never have been submitted to the Executive Board.

61.     Murray Huberfeld and Platinum Partners had caused COBA to lose 20 million dollars, 15 million of which was from the annuity fund and this matter had been central to the issue of the criminal trial of former COBA president Norman Seabrook.

62.     The COBA annuity funds are a matter of public concern, due to the funds being given to COBA by NYC to invest and become available for COBA Union Members upon their retirement.

63.     At the point in time when Mr. Husamudeen and lawyers Marc Steier, Nathaniel Charny, Vincent O'Hara as well as treasurer Mike Mieallo all knew the actual recovery was to be seven million dollars, the resolution was still proposed to the Executive Board to approve a six million

dollar settlement, without mention of the missing one million dollars.

64.     Mr. Craig was outwardly critical of all involved in the failure to disclose the correct

amount.

65.     Mr. Craig's concern was that someone would be attempting to pocket the extra million

dollars.

66.     On February 11, 2019 members of the Executive Board were informed they were to

attend training.

67.     Soon thereafter, Mr. Husamudeen caused all the Executive Board members to be excused

from attending that training, with the exception of the Plaintiff, who still had to attend training, a

ploy used to remove Mr. Craig from attending an Executive Board meeting.

68.     Release time is time officers are allowed to not report to work at a jail to attend other

activities such as a meeting of the Executive Board.

69.     Once elected to the Executive Board all COBA Members are to report to the Union and

not to the jails.

70.     On February 27, 2019 Mr. Husamudeen, without Executive Board approval, changed Mr.

Craig's assignments and in response, Mr. Craig asked for an emergency Board meeting on the

subject.

71.     Mr. Husamudeen unilaterally changed Mr. Craig's assignments, which had included

advocating for officers at the Board of Corrections; liason with the attorneys; monitoring

compliance with the Nunez decree; working with former chiefs and former Commissioner

Cranston facilitating meetings and discussions with the Board of Corrections and with federal

monitors; and assisting Mr. Husamudeen in writing speeches, producing commercials and

producing shows as well as initiating safety directives and overseeing for the Union the Office of the Chief of Security.

72.     The job of advocating for the officers at the Board of Corrections was taken over by Mr. Husamudeen himself.

73.     Mr. Craig was removed from this particular assignment so he could not as easily report The DOC's harmful activities to outside agencies, including DA's, advocacy groups, politicians, and newspapers who frequently attend the Board of Corrections meetings at which Mr. Craig had been exposing actions which were detrimental to the union members and the inmates.

74.     Mr. Husamudeen had requested that Mr. Craig endorse Tony Herbert for public advocate.

75.     Mr. Craig did so by shooting videos on Mr. Herbert's behalf endorsing his candidacy and by posting the videos on facebook.

76.     The videos were filmed without utilizing COBA's resources and without suggesting they were COBA backed endorsements, as Mr. Craig also supported Mr. Herbert in the election.

77.     But Mr. Husamudeen feigned outrage at Mr. Craig for shooting the videos and he alleged Mr. Craig was acting on behalf of the Executive Board without Board approval and used this as one of various pretexts to remove Mr. Craig from Board meetings.

78.     On February 28, 2019 Mr. Husamudeen demanded Mr. Craig be sent back to the prisons, subjecting Mr. Craig to the dangerous environment in the jails and away from the Board.

79.     Prior to that, due to his having release time as part of his position with the Executive Board, Mr. Craig spent no time in the jails as he was assigned to the COBA office.

80.     Ms. Guccione, against DOC rules, and without a transfer order, ordered Mr. Craig to report to RNDC the next day, whereas officers transferred are supposed to be given time to adjust

to their new assignment.

81.     At that point, Plaintiff and other Executive Board members had learned of Mr.

Husamudeen planning to accept a gift in the form of a trip offered by an unauthorized vendor,

which is possibly illegal, and which was the very same type of activity Mr. Husamudeen had

used against Norman Seabrook to remove him from the Presidency.

82.     Albert Craig responded by calling the Internal Department of Labor Relations whose

director is Defendant Maria Guccione and she did nothing to address the situation.

83.     Not only was Ms. Guccione not helpful, but she took a series of retaliatory actions against

Mr. Craig.

84.     Subsequently, when releasing Mr. Craig from the jail to conduct COBA's business, Ms.

Guccione charged Mr. Craig's vacation time, which was an improper act not done to any other

Union official.

85.     On March 2 & 5, 2019 in a Facebook video posted by a person speaking on behalf of Mr.

Husamudeen, it was alleged that Albert Craig was trying to get Mr. Husamudeen locked up.

86.     On March 6, 2019 Mr. Husamudeen met with Mr. Craig and told Mr. Craig he did not

want him in "his office," i.e., the Union Building, and Mr. Husamudeen told Mr. Craig "you got

that crazy broad talking about that trip," referring to an apparently illegal trip he had arranged to

take.

87.     On March 12, 2019 on his vacation time Mr. Craig spoke to the Board of Corrections

about officers being assaulted in the jail.

88.     On March 19, 2019 Albert Craig, along with another COBA Executive Board member,

went to the Department of Investigations (DOI) and spoke about a trip that Elias Husamudeen

had scheduled, inappropriately intending to use COBA Union Members' funds.

89.     Mr. Craig had requested Mr. Issac attend the meeting and Mr. Isaac declined.

90.     Mr. Craig had already informed Mr. Isaac that Mr. Husamudeen was writing checks without Board approval.

91.     Despite Mr. Isaac's refusal to participate in the March 19, 2019 meeting, the Plaintiff did meet with Jerome Corrica from the DOI and did complain about Mr. Husamudeen improperly taking a gift in the form of a trip from a vendor, a vendor not even authorized to do business with COBA,  and Mr. Husamudeen agreeing to take a trip from this unauthorized vendor was possibly the equivalent of a bribe.

92.     When Mr. Husamudeen was asked about the trip, he lied and said an authorized vendor gave him the trip, which still might be considered a bribe.

93.     Upon information and belief, Mr. Husamudeen was informed of Mr. Craig's meeting with the DOI by Steven Isaac who functions, whether appropriately or not, more as Mr. Husamudeen's personal attorney than as counsel for COBA.

94.     Koehler and Isaac receives approximately six million dollars annually for their work on behalf of COBA and upon information and belief Koehler and Isaac could not have COBA as a client without the support of COBA's president.

95.     Mr. Husamudeen subsequently cancelled the trip.

96.     Mr. Craig returned to speak with Jerome Corrica and complained about Mr. Husamudeen writing checks without Board approval.

97.     By August of 2018 Mr. Craig had already informed Mr. Isaac about Mr. Husamudeen spending money without Board approval and Mr. Isaac did nothing about it.

98.     Instead of assisting Mr. Craig, the Board and the members of COBA, Mr. Isaac recommended that Mr. Craig not complain or bring an action premised on Mr. Husamudeen's actions, and instead wait until the union elections and run against Mr. Husamudeen for the presidency of COBA.

99.     In so doing Mr. Isaac was essentially abdicating his responsibilities for the people he should have been representing either in the interest of aiding, or being afraid to act against, Mr. Husamudeen at the risk of losing a lucrative contract.

100.    In retaliation, for Mr. Craig talking about his conduct, including to an outside agency, Mr. Husamudeen turned off Mr. Craig's COBA email, he had all Mr,. Craig's calls forwarded to his office and he threatened that if he wanted his benefits, for him and his family, he would have to get them through his office.

101.    On March 29, 2019 Mr. Isaac, through a third party, did inform Mr. Craig that his COBA issued cell phone was being tapped, presumably by, or on behalf of Mr. Husamudeen, and he warned him to use his personal cell phone and not the one he was given to do COBA's business.

102.    The third party told Mr. Craig that Steve Isaac cannot help him if Mr. Craig calls him on his COBA issued phone.

103.    Shortly thereafter, most of Steve Isaac's communications with Mr. Craig were made to Mr. Craig's personal cell phone.

104.    Mr. Husamudeen has been pandering to and awarding large sums of money to COBA's attorneys, not to represent COBA interests, but to protect him personally and to do his bidding; even when Husamudeen's interests often were in conflict with those of the rank and file membership of COBA.

-14-

105.     Upon information and belief, Mr. Steier received from Husamudeen, a $30,000 raise without Board approval.

106.     On April 2, 2019 Mr. Craig met with Steve Isaac at a restaurant and Mr. Isaac asked Mr. Craig if he would run for the presidency.

107.     Mr. Isaac told Mr. Craig that Judges do not like getting involved in union disputes, which is why he did not want to bring suit regarding the allegations against Mr Husamudeen.

108.     He informed Mr. Craig that he would provide him with financial support if would run for the presidency of the union.

109.     At that same meeting, Mr. Isaac told Mr. Crag, he could not help him if he calls him at his office and he personally warned him to never call him from Mr. Craig's COBA issued telephone.

110.     On April 8, 2019, Mr. Husamudeen told COBA attorney Nathaniel Charny not to answer any of Mr. Craig's questions as he was inquiring about Mr. Husamudeen's suspicious activities and he complied.

111.     As a result, Mr. Craig complained to the New York State Grievance Committee for the Ninth Judicial District, about Mr. Charny failing to provide him with representation, in deference to protecting Mr. Husamudeen.

112.     On April 11, 2019 Plaintiff contacted the NYS Attorney General at which time he complained about Mark Steier having, what was in his eyes, a no show job courtesy of Mr. Husamudeen, as he was not reporting to the Union headquarters to work.

113.     Mr. Steier, was paid as if he was clocking in to the office and doing a full week's work.

114.     Marc Steier was hired by COBA, in part, to deal with grievances, advise the Board, retain

attorneys and oversee litigation, not to be Mr. Husamudeen's personal attorney which is primarily how he was functioning.

115.  Mr. Steier had registered with the bar association as practicing at 75 Broad Street, but had no office at that location, neither was he reporting to the Union's location.

116.  Mr. Craig contacted the NYS Attorney General's Office about Mr. Husamudeen's activities  and was told by that office to contact the Bureau of Charities, which is part of the NYS Attorney General's Office, which he did.

117.  On April 11 & 12, 2019 Mr. Craig inquired, to the Bureau of Charities via email, essentially about no show jobs being given out by Mr. Husamudeen and which DOCS was looking the other way at.

118.  On April 15 & 16, 2019 Mr. Craig continued to contact the Bureau of Charities and on those occasions he was informing the Bureau that he had observed corruption at COBA.

119.  Mr. Craig had a strong reason to believe Mr. Husamudeen knew about him contacting the Office of the Attorney General.

120.  Marc Steier had bragged to people at COBA about his having hacked into emails when he was working with Kohler and Isaac.

121.  Mr. Craig believed Mr. Steier had communicated to Mr. Husamudeen that Mr. Craig was reporting Mr. Husamudeen's activities.

122.  Upon information and belief, Mr., Steier and Mr. Husamudeen knew that Mr. Craig had been complaining to outside agencies about the $30,000 raise illegally given to Marc Steier without Board approval.

123.  On April 18, 2019 Mr. Steier even advised Mr. Craig that Mr. Husamudeen was

potentially liable for some of his actions.

124.    On April 18, 2019 Mr. Craig again contacted the Department of Investigation and spoke
with officer Jerome Corrica this time informing him of Mr. Husamudeen writing checks without
the Executive Board's approval.

125.    On May 1, 2019 Mr. Craig began communicating with the Office of the District Attorney
in the Bronx seeking to report Mr. Husamudeen's activities.

126.    After Mr. Husamudeen became aware that Mr. Craig was complaining to outside agencies
about his behavior, and even though Mr. Husamudeen had agreed to authorize Mr. Craig to have
release time twice a month to attend Financial and Board meetings, Mr. Husamudeen began
blocking Mr. Craig from attending such meetings.

127.    One tactic Mr. Husamudeen used to keep Mr. Craig from Board meetings was by failing
to provide him with the correct time for such meetings.

128.    The other Board members had permanent release time which Mr. Craig was entitled to as
well, and which he was not receiving in retaliation for his reporting Mr. Husamudeen's activities.

129.    On May 3, 2019 Mr. Craig informed the attorneys for COBA he was not in agreement
with COBA for not pursuing a suit against Mr. Husamudeen for his financial and other wrong
doings.

130.    On May 6, 2019 a Deputy Warden informed an officer that Mr. Craig could not represent
officers at Hearings, an integral part of his position, because Mr. Craig is not a recognized union
official-which is not true, and said falsehood was reported to the Deputy Warden by a relative of
Mr. Husamudeen.

131.    On May 8, 2019 Mr. Craig informed the Board that he believed his personal emails had

-17-

been hacked and informed the Board members that Mr. Steier was in possession of Plaintiff's

passcode pursuant to the federal prosecution of Norman Seabrook in which all Board members

had to give the federal prosecutors their passcodes.

132.    On May 20, 2019 Mr. Craig reached out to the insurance broker for COBA, Tom Aloia,

and Mr. Craig voiced concerns about COBA's finances and he provided Mr. Aloia with

information about improper and possibly illegal activities.

133.     Mr. Aloia told Mr. Craig he had read Koehler and Isaac's contract with COBA and that

Isaac's lawfirm was supposed to provide him with a lawyer.

134.    On May 22, 2019 at a general membership meeting, Mr. Husamudeen admitted that Mr.

Craig was sent back to the jail for doing "NOTHING" and that it is his right to send him back as

the president because he has control of "release time" and he openly admitted he just did not

want Mr. Craig in his office and he reiterated the same things at a September meeting.

135.    Mr. Craig responded Mr. Husamudeen does not have that power and he again complained

to the Board that Mr. Husamudeen was writing checks without Board approval.

136.    On May 23, Howard Wein a lawyer working for Koehler and Isaac informed Mr Craig

that COBA's insurance broker Tom Aloia called him about questions Mr. Craig  had asked him.

137.    Mr. Wein informed the Plaintiff to be expecting a call from either Steve Isaac or himself.

138.    Afterwards Mr. Craig could never get Mr. Wein on the telephone and he never received a

call from Steve Isaac to discuss the matter.

139.    On June 8, 2019 Mr. Craig called a Bronx ADA to make an appointment, and he

informed the ADA about corrupt acts he believed were being committed by Mr. Husamudeen

and he made that telephone call from his COBA issued cell phone.

-18-

140.    On June 26, 2019 Mr. Craig, contacted the Board members, requesting that General

Counsel Steve Isaac be present at a Board meeting due to his plan to discuss COBA by-law

violations and he also informed the Board members that he had not received notice of his release

time to appear at the Board meeting.

141.    Only one hour before the meeting, Mr. Husamudeen gave the Board members a proposed

ten million dollar budget and the Board approved it over several objections with no discussion

and without adequate time to review the document.

142.    Steve Isaac failed to appear at the Board meeting and he failed to respond to Mr. Craig's

communication with him.

143.    Shortly after Mr.  Craig's call to the Bronx ADA on June 26, 2019, Plaintiff's direct

deposit of his salary was not in his account, a problem which he had not experienced previously.

144.    Mr. Craig made a call to the civilian head of payroll-and she told him he had not shown

up for work for 60 days, which was patently false.

145.    On July 11, 2019 Plaintiff made a telephone call during which he was informed he had

been paid as usual; which was simply not true.

146.    This problem was subsequently resolved in Plaintiff's favor.

**FURTHER RETALIATION**

147.    On August 2, 2019 Albert Craig received an email from Mr. Husamudeen demanding he

return all COBA equipment which is a benefit to which COBA Board members are entitled.

148.    Also on August 2, 2019, Mr. Husamudeen improperly provided Mr. Craig's release time

to officer Toussant Boyd, who was not entitled to said release time but who had great influence

over many correction officers and who could assist Mr. Husamudeen in the upcoming election

for the presidency of the Board.

149.    On August 14, 2019 Mr. Craig was forced to attend training which he complied with.

150.    The next day Mr. Craig received a disciplinary note from Captain Jeannie Mestre stating

Mr. Craig had left his assigned post without permission and asking him for a write-up report;

over the patently false allegation.

151.    On August 20, 2019 the Board members were released early from the jails by  Defendants

Maria Guccione and Mr. Husamudeen; everyone but Mr. Craig, who could not attend the Board

meeting because Mr. Craig's release time was given by Mr. Husamudeen to another individual.

152.    Between August 26-29, 2019 Mr. Husamudeen denied Mr. Craig his release time for a

delegate seminar which was mandatory for all COBA Board members to attend.

153.    Part of Mr. Husamudeen's job with COBA is to put in requests that officers who needed

to attend meetings be given release time.

154.    On one occasion, when Mr. Craig showed up to a meeting he was entitled to attend,

Plaintiff was wrongrully given a late slip, as Mr. Husamudeen had not put in the application for

Mr. Craig to be given release time that day.

155.    When Plaintiff showed up at the meeting, Mr. Husamudeen went into his own office and

called Ms. Guccione and she somehow came up with only 1 hour of release time-an insufficient

time period for Mr. Craig to attend the meeting.

156.    No other Board member was given only one hour of release time to attend that meeting.

157.    The time which Mr. Craig then allegedly missed from work was taken out of his vacation

time-this was done to him twice, despite the fact that neither Mr. Husamudeen nor Ms. Giaccone

have the authority to take away vacation time to cover allegedly missed time working.

158.     On September 12, 2019 Mr. Craig reached out by email, to the NY Times requesting to speak about corruption within COBA and he emailed them with his COBA email which he believed was being hacked.

159.     On September 12, 2019 Mr. Craig sent an email to Joseph Caputo, the Deputy Warden of RNDC, the prison at which Mr. Craig now works, which was forwarded to Defendant Guccione requesting an investigation into his being falsely charged with departing training without permission and he sent the email with his COBA email which he believed was being hacked.

160.     The false charges were caused to be brought against Mr. Craig by Mr. Husamudeen, who knew the charges were false, and to protect Mr. Husamudeen, Defendant Guccione took no action.

161.     On September 26, 2019 Mr. Craig received an email from Mr. Husamudeen demanding he return the COBA vehicle he is entitled to by virtue of his position with the Executive Board, stating the lease was up in October, which proved to be false.

162.     While Mr. Craig has retained the vehicle, he is now forced to pay for his own gas and maintenance of the vehicle, things which he is entitled to be compensated for via virtue of his position.

163.     On October 9, 2019 Mr. Craig contacted Defendant Commissioner Brann detailing some of the harassment and retaliation he was experiencing at the hands of Mr. Husamudeen and he emailed her with his COBA email.

164.     In that email, Mr. Craig informed Defendant Commissioner Brann of several of the things that were being done to him in retaliation for his speaking out, and he informed her that Defendant Ms. Guccione had demonstrated a clear bias against him including by denying him the

ability to act as a member of the Board.

165.    Mr. Craig also informed Commissioner Brann that Mr. Husamudeen had threatened him

in the presence of members of the Executive Board to make a false police report claiming he

stole a COBA vehicle.

166.    If arrested, Mr. Craig would necessarily have been suspended, and he would not have

been able to work and provide for his family.

167.    Mr. Craig further requested of Defendant Brann that all communications from the parties

involved in the allegations in his complaint be preserved and referred to the proper authorities.

168.    On October 22, 2019 Defendant Commissioner Brann responded that she found no

harassment despite overwhelming evidence to the contrary.

169.    By November of 2019 the word was clearly out that Mr. Craig was *personna non grata* at

the DOC, and it was open season to abuse him as an enemy of the administration.

170.    On November 7, 2019 Mr. Craig had a dispute with Defendant ADW Desiree Hill at

which time Defendant Hill put her hands in Mr. Craig's face and called him an old MF'er.

171.    Acting Warden Caputo for RNDC and other facilities operated by DOCs had adopted a

policy of mandating that officers could not respond to emergency situations with their batons,

greatly endangering the officers' physical well being.

172.    When Mr. Craig responded to an emergency on November 7, 2019 at RNDC, with two

other other delegates near the area of the incident in the hallway of RNDC, he spoke with

Defendant Hill and told her the officers need their batons to safely deal with the violent situation

which was in progress.

173.    Defendant Hill became irrate and directed her anger at Plaintiff as he was attempting to

-22-

contact the Chief of the Department to get help during the emergency, on his COBA issued phone.

174.    Defendant Hill screamed at Mr. Craig that he was no longer with the union, which was false.

175.    Defendant Hill threatened to have Mr. Craig suspended for using his union issued cell phone, which was permissible for him to do.

176.    Defendant Hill threatened Mr. Craig that she would have him suspended for 15 days due to having his cell phone.

177.    When Mr. Craig complained to Warden Caputo about Defendant Hill's actions, he refused to act.

178.    On November 22, 2019 Mr. Husamudeen showed up at RNDC and shortly thereafter Acting Warden Caputo told Mr. Craig he had it on a reliable source that he was not allowed to have his cell phone, which was not true.

179.    Acting Warden Caputo told Mr. Craig he was supposed to actively respond to alarms and not to come there to "harass" Defendant Hill something he had not done.

180.    On December 6, 2019 Mr. Craig had found out from the newspapers about a $240,000 installment allegedly to be paid to COBA towards the 1.2 million dollar settlement with Mr. Rechnitz arising from the Platinum Partners scandal.

181.    In communications beginning on December 18, 2019 between Mr. Craig and COBA attorneys, Mr. Steier, Mr. Charny Mr O'Hara, it was discussed that a deal was struck between Mr. Rechnitz and COBA for COBA to recover 1.2 million dollars from Mr. Rechnitz.

182.    Upon information and belief, at no previous time had Mr. Husamudeen or any of the

COBA lawyers informed members of the Board about the deal and the exact amount of money recovered in the first installment or in any subsequent installment.

183.    When Mr. Craig repeatedly questioned all the COBA attorneys, Mr. Steier, Mr. Charny, and Mr O'Hara, in sum and substance about why the Board had not been informed earlier that there was a settlement with Mr. Rechnitz, or the amount recovered to date, they refused to respond with clear and concise answers.

184.    The Board had not been presented with a resolution to adopt the settlement, or the terms of the settlement, nor was the Board informed whether or not any money had been recovered to date.

185.    To date, Mr. Craig has not seen or heard of a Board resolution accepting the terms of the settlement deal and details about the possible receipt of any of the funds are at best sketchy.

186.    Mr. Craig questioned Mr. Steier's ethics for failing to answer his questions about the Agreement with Mr. Rechnitz.

187.    Mr. Steier responded with an email that started with; "Mr. Craig this email is just you and I, A final chance to work in concert, if you will."

188.    The email continues with a long recitation by Mr. Steier about how good to the Union Mr. Steier had allegedly been, and ends with what Mr. Craig perceives to be a threat; "(t)his is my last request to you on this matter;  I make it because I see this going very poorly for all concerned - not the least you and I and the entire Union leadership that now more than ever NEEDS to come together."

189.    The Plaintiff interpreted this as a threat and did report that perceived threat to an outside agency.

190.    It had become clear to Mr. Craig that in many situation virtually all of the lawyers for

COBA were working to forward the interests of Mr. Husamudeen and not for the Executive

Board members or the rank and file.

191.    To this day, Mr. Husamudeen has refused to answer the question where the money is

from Mr. Rechnitz.

**THE CORONA VIRUS**

192.    When the pandemic was underway, the DOC promulgated a memo essentially threatening

officers about being terminated if they took off too frequently.

193.    NYC didn't secure its first order of emergency protective gear and supplies until March 6,

2020, however the gear was not distributed to correction officers at that time.

194.    On March 10, 2020 Mr. Craig attended a Board of Correction meeting and spoke

complaining at that meeting about the corona virus and safety concerns for correction officers not

being properly addressed by the DOC.

195.    Mr. Craig raised the issue of the corona virus at Rikers and spoke about the DOC

penalizing correction officers for being out sick; the officers need for search gloves; the need to

put spit masks on spitting inmates who spit in officers' mouths; for the officers to be informed

when someone around them was ill; the need for hand sanitizer; as well as for guidance as to how

to react if ordered to search an inmate who was at that time spitting and coughing, actions which

were increasingly dangerous and happening more frequently once the virus reached the prisons.

196.    On the morning of March 10, 2020 Husamudeen had confirmed that a relative of a

civilian employed at Rikers was ill with the Corona Virus and Mr. Husamudeen had done

nothing at that point to assist the officers or the inmates in getting masks that NYC and the DOC

had obtained for them and refused to distribute to the officers.

197.    The DOC had promulgated a policy insisting the correction officers not wear masks, even if they had their own, because they allegedly did not want to "frighten" the inmates; and this DOC policy endangered officers and eventually the public's well being.

198.    When an officer wore a mask without permission, they could be disciplined-so they were given the Hobson's choice of either facing infection, and possible death, or possible discipline.

199.    At that point the DOC was still insisting that correction officers search inmates, without gloves being distributed, as they entered and exited their cells, a practice which could result in contracting the virus.

200.    On March 13, 2020 Justine Luongo of the Legal Aid Criminal Justice Society, informed Defendant Brann, the DOC and Elizabeth Glazer of the Mayor's Office of Criminal Justice that she had received numerous reports of the absence of protective measures being taken to protect people inside the City's jails.

201.    Ms. Luongo communicated that hand sanitizer was being treated in the prison as contraband, which was true for both inmates and officers.

202.    Ms. Luongo also reported that inmates were being told if they wanted soap they had to buy it from commissary, which is problematic for two reasons; 1) not all inmates have any funds, and 2) soap is mandatory to help stop the spread of the virus.

203.    On March 17, 2020 the RNDC facility on Rikers held roll call with the officers made to stand shoulder to shoulder, in spite of the general public having been instructed to employ social distancing.

204.    On March 19, 2020 Mr. Craig was ordered to not allow the inmates to have their

constitutionally mandated recreation time, which was planned to be given in the gym, an unconstitutional Order which he declined to follow.

205.    Recreation for the inmates is not only constitutionally mandated, but it has the effect of calming down disruptive inmates, and without the recreation the prison would be an even more dangerous place for both inmates and officers.

206.    Upon information and belief, this was ordered to help further the City's plan premised on Rikers being a dangerous, unmanageable place that needs to be closed.

207.    On March 20, 2020 the failure to provide recreation for the inmates was reported to the Board of Corrections by Mr. Craig.

208.    In retaliation for his complaints Defendant Hill went to the Deputy Warden and falsely reported that Mr. Craig was not allowed to have his COBA issued cell phone, and attempted to get Mr. Craig suspended; she was unsuccessful.

209.    On March 21, 2020 Mr. Craig reached out to New York State assemblymen asking for assistance during the pandemic and explaining that the DOC at best could be described as having done little to help prevent the spread of the virus and that the DOC was not cleaning the facilities, providing masks, providing hand sanitizer, or soap and was not insisting on social distancing.

210.    Also on March 21, 2020 Mr. Craig published a video on facebook complaining about the problems at the DOC and thanking Speaker of the New York State Assembly, Carl Heastie's office who he reached out to and who returned his calls and was supportive regarding the inactivity of the Union.

211.    At that point Mr. Heastie's office had called the Mayor and informed him of Mr. Craig's

complaints.

212.    Mr. Craig was the first member of COBA to speak out about the need for masks.

213.    Also on March 21, 2020 Mr. Husamudeen finally asked for PPE for his officers during a Fox news interview.

214.    However, Mr. Husamudeen was still advocating for a mask most officers could not qualify to wear.

215.    The DOC has masks officers use to respond to emergencies.

216.    In order to use the emergency masks officers need to pass the "Fit Test."

217.    In order to pass the "Fit Test," the officer seeking to employ such a mask must not suffer from Asthma, HTN, or diabetes which would disqualify him or her from using the mask.

218.    HTN, asthma, and diabetes are enormous problems in the African-American communities in New York, and a majority of correction officers are of African-American descent-precluding a large number of them from ever employing those emergency masks.

219.    In lockstep with the DOC, up until March 22, 2020 Mr. Husamudeen was only advocating for the masks officers needed to pass the "Fit Test" to be allowed to wear.

220.    When the DOC first issued a limited number of N-95 masks, which upon information and belief was on March 22, 2020, Commissioner Cynthia Brann issued an internal memo, that said "these masks are limited in quantity, and that they would be reserved for personnel working in quarantined areas, transporting inmates with flu-like symptoms and any circumstances areas deemed necessary by the department" and they were not provided to all the officers nor to any of the inmates.

221.    On March 22, 2020 after Mr. Craig had spoken repeatedly about the threat the virus and

lack of PPE posed to the officers, Mr. Husamudeen threatened the Board members of COBA instructing them not to make public statements as if they emanated from COBA.

222.    Mr. Craig responded to Mr. Husamudeen telling him he had done nothing for officers regarding the current crisis and discussed Mr. Husamudeen begging the mayor for money while COBA had millions of dollars for supplies, which for some inexplicable reason, he had not used that time to protect the rank and file he was supposed to be representing.

223.    While it is impossible to know Mr. Husamudeen's motivation behind not spending COBA funds to that point in time to protect the well being of his Union's rank and file, it does appear he used some of those same funds to shoot a campaig video for his reelection.

224.    Mr. Craig discovered on March 22, 2020 and he communicated the fact to Mr. Husamudeen and the Executive Board that he knows that Mr. Husamudeen had spent COBA Union Members funds to take officers to Las Vegas.

225.    Also on March 22, 2020 Defendant Brann reversed one of her policies and for the first time explicitly allowed officers to bring and wear their own masks but by that point in time many officers had already become ill and NYC was already on lockdown.

226.    Not until late in March, after more than 2 weeks of complaining and advocating for masks to protect the rank and file by Mr. Craig, did Husamudeen decide to use COBA money to purchase 25,000 masks which he finally provided to the officers on March 27, 2020.

227.    As of mid April 2020, close to 900 officers had contracted the virus, including Mr. Craig, and several officers and at least one inmate had died.

228.    On April 15, 2020 the DOC finally issued new, but not enforceable guide lines for social distancing within its jails.

229.    The guidelines limit the day rooms to groups of 10 inmates for two-hour blocks and only

four are allowed in the showers or bathroom at a time.

230.    However, the social distancing poster promulgating the new "rules," says inmates will not

be infracted for flouting the rules and "officers are not to use force to enforce these measures"

i.e., there was virtually no way to enforce the guidelines.

231.    "These enhanced social distancing guidelines went into effect on April 15, and they build

upon many other measures that were already in effect," said Deputy Commissioner of Public

Information Peter Thorne.

232.    Ironically, on April 19, 2020 the DOCS donated 30,000 masks to the FDNY.

233.    It was later revealed on or about April 23, 2020 that the masks given to the FDNY were

already in a DOC storehouse before they were given to the FDNY.

234.    The masks given to the FDNY may have prevented the rampant Corona Virus outbreak

from spreading among COBA members and inmates and subsequently to members of the public

once the mass release of inmates was and is still being effected, and may have prevented Mr.

Craig, who had been improperly sent back to the jails to work, from being infected as well.

235.    On May 7, 2020 frontline nurses at Riker Island jail protested over the shortages of

protective gear, and basics such as soap and water at Rikers.

236.    Nurses rose up after the death of one of their fellow co-workers, William Chen, who

passed following an incident with a positive Covid- 19 inmate.

237.    The nurses complaints affirmed Mr. Craig's complaints of a lack of safety measures at

NYC jails for frontline employees, and the nurses demanded that basic needs in light of the

pandemic be met to protect the lives of the inmates, and themselves which would also protect the

-30-

correction officers.

238.    To date, Mr. Craig has lost release time from the jails, he has been harmed financially including but not limited to Mr. Craig paying for his own gas and maintenance on the vehicle he is entitled to and which he needs by virtue of his position with the Board; he is being continually subjected to hostile actions, intended to harm him emotionally and financially; he is spending time in the increasingly dangerous and violent jails which he had not been forced to do prior to speaking out and exercising his First Amendment rights on matters of public interest; and he has become severely physically and emotionally ill due to the retaliation against him.

239.    At the time he was allowed to spend at the Union, once Mr. Craig began complaining about Mr. Husamudeen, he frequently felt the necessity to sit in his office, afraid to move about, as he had deep emotional concerns for his safety, economically, physically and otherwise.

240.    The Defendants have an interest adverse to the general public in that they need to keep Rikers more dangerous and violent than it needs to be, to justify enacting their plan and they have taken actions contrary to the obligations of the jobs they were entrusted with and in stark contrast to the public's well being.

241.    As Mr. Craig stands as an obstacle to their plans the Defendants have acted individually and collectively to chill his right to free speech with frequent and ongoing retaliatory acts against him.

242.    Opportunistically, when officers started dying, NYC continued to publicize that Rikers is not safe.

243.    The Defendants have worked in unison to suppress Mr. Craig's freedom of speech, which was made in addressing matters of grave public interest.

244.    As a result of Mr. Craig complaining not only internally but frequently externally to outside agencies, he has been retaliated against by the Defendants and he has been, and continues to be, harmed by the retaliation that he has experienced and to which he is still subjected.

245.    Distilled down to its essence this case is about extreme greed and corruption, and in this matter the corruption is costing the health and lives of New Yorkers, many of whom have yet to be directly effected by the Defendants' acts which have already damaged the Plaintiff, and Defendants' plans are ominously poised to severely harm many more of us in the not distant future.

### AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION RETALIATION IN VIOLATION OF THE FIRST AMENDMENT PURSUANT TO 42 U.S.C. § 1983 COMMITTED BY THE DEFENDANT INDIVIDUALS

246.    Plaintiff repeats the allegations contained in the prior paragraphs as if fully stated herein.

247.    By reason of the forgoing, the individual Defendants violated Plaintiff's rights guaranteed by the First Amendment to the United States Constitution, more specifically his right to speak freely on matters of public concern.

248.    Mr. Craig spoke out on matters of public concern involving the inappropriate moving of moneys belonging to COBA, the safety of officers, the safety of inmates and the safety of the general public and he suffered several serious, adverse employment actions as a result which harmed him financially, harmed him physically, harmed him emotionally as well as otherwise and there was a causal and temporal relationship between the adverse employment actions and Mr. Craig excercising his right to free speech and the motivating factor for the adverse employment actions was Plaintiff speaking to outside agencies on matters of public concern.

249.    It is not part of his prescribed obligations as part of his role with the Executive Board for

Mr. Craig to make complaints to outside agencies about corruption.

250.    As a result the Plaintiff has been rendered seriously ill, threatened with death, been caused to fear for his and his family's lives, he has been damaged pecuniarily, and he has been harmed emotionally and otherwise.

251.    As a result of Defendants' actions, Mr. Craig is entitled to economic damages in the amount of ONE MILLION DOLLARS, and he is entitled to punitive damages, against the individual Defendants to be assessed by the trier of fact and an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 is appropriate.

**AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION<br>PURSUANT TO 42 U.S.C. § 1983<br>MONELL CLAIM AGAINST NYC**

252.    Plaintiff repeats the allegations contained in the prior paragraphs as if fully stated herein.

253.    Defendant has acted pursuant to various policies in violating Plaintiff's rights.

254.    The violations of Plaintiff's constitutional right to Free Speech occurred because of NYC's municipal *de facto* policy of doing whatever is necessary to demonstrate Rikers needs to be closed as it is violent, dangerous and unnecessary.

255.    Ms. Brann as an official who is responsible for establishing NYC municipal policies with respect to procedures on Rikers, has inspired a widespread practice that is permanent and well settled and which constitutes a 'custom or usage' with the force of law, which is to ignore the safety of officers and to look the other way from inmate on officer and inmate on inmate violence.

256.    Ms. Brann and the City have acted with malicious intent in intentionally subjecting both officers and inmates to the spread of the pandemic and in so doing Mr. Craig was a victim.

-33-

257.   Mr. Craig's actions in speaking to outside agencies, threaten the illegal and immoral

policies of NYC enforced by Defendant Brann as a final decision maker and endorsed implicitly

by NYC and due to Mr. Craig speaking out on these matters of public concern he has been

retaliated against.

258.   Defendant Brann has looked the other way at corrupt actions by Defendant Husamudeen

in return for his actions in conformity and in support of NYC's illegal and unethical policies.

259.   NYC's policies caused the constitutional violations which occurred specifically because

of NYC's policies to the detriment of Mr. Craig.

260.   NYC's actions in response to the pandemic resulted in a state created danger,

intentionally created and exacerbated with malice and with the single minded objective of closing

Rikers and effecting its sale.

261.   As a result the Plaintiff has been rendered seriously ill, threatened with death, been

caused to fear for his and his family's lives, he has been damaged pecuniarily, and he has been

harmed emotionally and otherwise.

262.   As a result Mr. Craig is entitled to economic damages in the amount of ONE MILLION

DOLLARS, and an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 is

appropriate.

**AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION**
**PURSUANT TO 42 U.S.C. § 1983**
**SUPERVISOR LIABILITY AGAINST DEFENDANT BRANN**

263.   Plaintiff repeats the allegations contained in the prior paragraphs as if fully stated herein.

264.   Defendant Brann is liable to Mr. Craig for the violations of his rights guaranteed by the

First Amendment to the United States Constitution.

265.   Defendant Brann failed to supervise her subordinate employees who were retaliating

against Mr. Craig for exercising his First Amendment right to speak out about matters of public concern.

266.    Defendant Brann participated directly in the constitutional violations by knowing of and ignoring and even sanctioning retaliatory actions taken against Mr. Craig.

267.    Defendant Brann, after being informed of the malicious actions being taken against Mr. Craig, failed to control or supervise her subordinates who were perpetuating said acts against Mr. Craig when it was within her power and she was even obligated to do so.

268.    Defendant Brann was grossly negligent in supervising subordinates who committed the wrongful acts being perpetrated against Mr. Craig.

269.    Defendant Brann exhibited deliberate indifference to the rights of Plaintiff by failing to act on information indicating that unconstitutional acts were occurring.

270.    As a result of Defendant Brann's actions and failures to act, the Plaintiff has been rendered seriously ill, threatened with death, been caused to fear for his and his family's lives, he has been damaged pecuniarily, and he has been harmed emotionally and otherwise.

As a result Mr. Craig is entitled to economic damages in the amount of ONE MILLION DOLLARS, and he is entitled to punitive damages, against the Defendant Brann in an amount to be assessed by the trier of fact and an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 is appropriate.

**AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION**
**PURSUANT TO 42 U.S.C. § 1983**
**VIOLATION OF THE PLAINTIFF'S SUBSTANTIVE DUE PROCESS**
**RIGHT TO BE FREE FROM STATE CREATED DANGERS**
**PURSUANT TO THE FOURTEENTH AMENDMENT**
**AGAINST NYC AND DEFENDANT CYNTHIA BRANN**

271.    Plaintiff repeats the allegations contained in the prior paragraphs as if fully stated herein.

272.     The Fourteenth Amendment to the United States Constitution guarantees a substantive

due process right for the Plaintiff to be protected from both state created dangers and the

increased risk of such dangers.

273.     Substantive due process protects the Plaintiff against state actors where the governmental

entity itself, in this instance, NYC via the DOC, and Defendant Cynthia Brann, have a

constitutional obligation not to cause a state created danger as well as an obligation not to greatly

increase the risk of such state created danger, threatening to Plaintiff's (as well as all similarly

situated officers') lives and well being.

274.     NYC, via the DOC, and Defendant Cynthia Brann have violated Plaintiff's (and all

similarly situated officers') substantive due process rights by the defendants' deliberate acts in

face of a well known danger, which did upon information and belief cause Plaintiff to be

rendered seriously ill, threaten him with death, cause him to fear for his and his family's lives,

damage him pecuniarily, and did harm him emotionally and otherwise.

275.     The defendants, through their promulgated policy of denying masks to both the plaintiff

(as well as to all similarly situated officers) and to the inmates in plaintiff's charge, in the face of

a known potentially deadly, contagious virus, when the defendants did in fact have access to said

masks, created and greatly increased the danger of infection, which upon information and belief

plaintiff did in fact contract due to the defendants' acts.

276.     The defendants through their promulgated policy of not even allowing the plaintiff (as

well as all similarly situated officers) to bring their own masks to wear in the face of a known

extremely contagious virus, both created and greatly increased the danger of infection, which

plaintiff did in fact contract upon information and belief due to the defendants' acts.

277.    The defendants through their promulgated policy of not regularly issuing gloves to the plaintiff (as well as all similarly situated officers) and by their policy of mandating searches be conducted of inmates entering and exiting their cells, in the face of a known extremely contagious virus, both created and greatly increased the danger of infection, which plaintiff did in fact contract upon information and belief due to the defendants' acts.

278.    The defendants through their promulgated policy of insisting on "Fit Tests" for the officers to pass in order to use the masks employed in emergency situations in the predominantly African American DOC, largely disqualified African American officers from employing such masks, in the face of a known extremely contagious virus, which both created and greatly increased the danger of infection, which plaintiff did in fact contract upon information and belief due to the defendants' acts.

279.    While defendants did not create the virus, they created and greatly increased the danger to the plaintiff by forcing him to be exposed to the virus while withholding protection in their possession and not allowing plaintiff to bring and use his own protection against contraction.

280.    Defendants' actions, as stated above, clearly constitute egregious executive action and are clearly arbitrary in the constitutional sense, and they shock the conscience.

281.    Defendants' actions were deliberately intended to injure, in that they were intended to make the Rikers complex more dangerous for officers and inmates to justify their malicious, economically motivated plan to sell the expensive piece of real estate.

282.    Due to the defendants' being responsible for a state created danger and the increased risk of such danger which upon information and belief rendered the plaintiff seriously ill, and which did in fact cause him to fear for his life and the lives of his family members, to lose sleep, to fear

attending work and did in fact otherwise harm the plaintiff the defendants are liable to the

plaintiff for violation of his rights protected by the due process clause of the Fourteenth

Amendment.

283.    There is no other provision of the Constitution which protects plaintiff's rights against the

arbitray and conscious shocking treatment that he was subjected to at the hands of the defendants.

284.    As a result the Plaintiff has been rendered seriously ill, threatened with death, been

caused to fear for his and his family's lives, he has been damaged pecuniarily, and he has been

harmed emotionally and otherwise.

285.    As a result Mr. Craig is entitled to economic damages in the amount of ONE MILLION

DOLLARS, and he is entitled to punitive damages, against defendant Brann in an amount to be

assessed by the trier of fact and an award of costs and attorneys' fees from all the defendants is

appropriate pursuant to 42 U.S.C. §1988 is appropriate.

   **WHEREFORE,** plaintiff respectfully request that judgment be entered as follows:

   (A)    Declaratory relief finding that Plaintiff's rights under the United

          States Constitution were violated;

   (B)    Compensatory damages to be determined at trial in a sum not less

          than $1,000,000.00 (ONE MILLION) DOLLARS

   (C)    By reason of the wanton, willful and malicious character of the conduct

          complained of herein, punitive damages against the individual Defendants

          in an amount to be determined at trial;

   (D)    An award to Plaintiff of the costs and disbursements herein;

   (E)    An award of attorneys' fees under 42 U.S.C. §1988; and

    (F)       Such other and further relief as this Court may deem just and

        proper.

Dated: New York, New York
      May 12, 2020

                              / s /
                         FRED LICHTMACHER
                         The Law Office of Fred Lichtmacher P.C.
                         Attorney for Plaintiff
                         116 West 23rd Street Suite 500
                         New York, New York 10011
                         Tel. No. (212) 922-9066
                         Empirestatt@aol.com

To:
THE CITY OF NEW YORK
100 Church Street
New York, New York 10007

ELIAS HUSAMUDEEN
77-10 21st Avenue
East Elmhurst, N.Y. 11370

NYC DEPARTMENT OF CORRECTIONS
COMMISSIONER  CYNTHIA BRANN,
New York City Department of Correction
75-20 Astoria Blvd.
East Elmhurst, NY 11370

MARIA GUCCIONE EXECUTIVE DIRECTOR
OF LABOR RELATIONS AT
NYC DEPARTMENT OF CORRECTIONS
75-20 Astoria Blvd
East Elmhurst NY, 11370

DEPUTY WARDEN DESIREE HILL
75-20 Astoria Blvd
East Elmhurst NY, 11370