UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
ALBERT CRAIG,                                         :
                                                     :
                        Plaintiff,                    :
                                                     :
                                                     :          **DECISION AND ORDER**
          -against-                                   :
                                                     :          1:20-cv-02152 (LDH)(PK)
                                                     :
THE CITY OF NEW YORK, ELIAS                           :
HUSAMUDEEN, NYC DEPARTMENT OF                         :
CORRECTIONS, COMMISSIONER                             :
CYNTHIA BRANN, EXECUTIVE                              :
DIRECTOR OF LABOR RELATIONS AT                        :
NYC DEPARTMENT OF CORRECTIONS                         :
MARIA GUCCIONE and DEPUTY WARDEN                      :
DESIREE HILL,                                         :
                                                     :
                        Defendants.                   :
------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

Albert Craig ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983, alleging deprivation of

his rights under the First and Fourteenth Amendments of the U.S. Constitution against the City of

New York, Elias Husamudeen, New York City Department of Corrections Commissioner Cynthia

Brann, Executive Director of Labor Relations at New York City Department of Corrections Maria

Guccione, and Deputy Warden Desiree Hill (collectively, "Defendants").  (*See* Compl., Dkt. 1; Am.

Compl., Dkt. 28.)

Before the Court are two motions.  The first is Plaintiff's motion seeking to disqualify

Nathaniel K. Charny, Esq., from acting as counsel for Defendant Husamudeen and requesting that

Charny be investigated by the Court, law enforcement, and bar association entities.  ("Motion to

Disqualify" at 1 (ECF pagination), Dkt. 42.)  The second is Defendant Husamudeen's motion for

sanctions against Plaintiff and Plaintiff's counsel, Lakshmi Gopal, Esq., pursuant to Rule 11 of the

Federal Rules of Civil Procedure, 28 U.S.C § 1927, and 42 U.S.C § 1988, based on the allegations in

1

Plaintiff's Motion to Disqualify. ("Motion for Sanctions," Dkt. 52). The Honorable LaShann DeArcy Hall referred both motions to the undersigned for a Decision and Order. (*See* May 27, 2021 Order Referring Motion to Disqualify; July 22, 2021 Order Referring Motion for Sanctions.) For the reasons set forth below, the Court denies the Motion to Disqualify and grants in part and denies in part the Motion for Sanctions.

## BACKGROUND

Plaintiff is a New York City corrections officer and member of the Correction Officers' Benevolent Association, Inc. ("COBA"), a New York City correctional officers' union. (Am. Compl. ¶ 5; Declaration of Lakshmi Gopal ("Gopal Decl.") ¶ 2, Dkt. 42-1.) The COBA Executive Board ("Board" or "Executive Board") manages and administers COBA's Annuity Fund, a pension fund which provides annuity benefits to eligible COBA members. (Gopal Decl. ¶ 8.)

Plaintiff was elected to serve as a COBA delegate for his facility at the Rikers Island jail complex, the Robert N. Davoren Center ("RNDC"); he was appointed to the Executive Board in 2013 and was re-appointed in approximately 2016. (*Id.* ¶¶ 1-6.) He also served as a trustee for the COBA Annuity Fund. (*Id.* ¶ 16.)

Defendant Husamudeen served as COBA President from 2016 to 2020. (*Id.* ¶ 10.)

In 2016, former COBA President Norman Seabrook was indicted, along with hedge fund manager Murray Huberfeld, for participating in a kickback scheme involving investments of money from COBA's Annuity Fund and General Fund into Platinum Partners, a hedge fund co-founded by Huberfeld. (*See id.* ¶ 7; Am. Compl. ¶ 23.)

Beginning in 2017, the COBA Annuity Fund retained Charny to recuperate, or "claw back," its losses resulting from the Platinum Partners scheme. (Gopal Decl. ¶¶ 12-13.) This "Platinum Clawback Team" reported to Husamudeen and consisted of Charny; COBA's Legal Director Mark Steier; and another lawyer, Vincent O'Hara. (*Id.* ¶¶ 11, 14-15.)

Plaintiff states that in his role as an Annuity Fund trustee, he "raised repeated concerns about suspicious failures and irregularities surrounding the recuperation of funds into the COBA Annuity Fund." (*Id.* ¶ 17.)   Plaintiff claims to have reported three instances of "illicit activities": (1) a discrepancy in the amount of money the Board was told they were receiving from Huberfeld; (2) a travel gift Husamudeen received from a former employee of a COBA vendor; and (3) the Platinum Clawback Team's failure to inform the Board about an alleged restitution payment from Jona Rechnitz, a participant in the Platinum Partners scheme.  (*See id.* ¶¶ 17-18.)

***The Huberfeld Clawback Deal*** - On January 13, 2019, during an emergency telephone conference, Husamudeen informed the Board of a clawback deal that had been reached with Huberfeld.  (*See id.* ¶ 19; Am. Compl. ¶ 23.)  Husamudeen forwarded the Board an email from Steier, who described it as a "$6,000,000 deal" (Gopal Decl. ¶ 19), stating, "[t]ime is of the essence as the deal must be presented to the Judge tomorrow for Huberfeld to obtain any 'credit' for this voluntary payment" as part of his sentencing.  (Ex. K-1 to *id.*, Dkt. 42-2.)  The Board voted to approve the deal over the telephone, with the promise that they would follow up with an in-person resolution.  (Gopal Decl. ¶ 21.)

After the telephone vote, Plaintiff learned, through a newspaper article, that the clawback deal was for $7 million.  (*Id.* ¶ 22; Ex. K-2 to *id.*, Dk. 42-2.)  Plaintiff contends that at the follow-up Executive Board meeting, Plaintiff and another Board member "admonished" Steier and Charny "for their failures to correctly report the actual amount at stake" in the deal.  (Gopal Decl. ¶¶ 25-26, 134.) According to Plaintiff, Steier and Charny explained that their failure to report the $1 million discrepancy was due to "the urgency around the deal."  (*Id.* ¶ 27.)  Plaintiff claims that he and other Board members refused to sign the resolution, which still described the deal as being for $6 million. (*Id.* ¶¶ 29-31.)  He also claims that more than a year later, "no … resolution [for a $7 million deal] was presented to the Executive Board in Plaintiff's presence."  (*Id.* ¶¶ 32-33.)

3

Defendant Husamudeen explained that after the $6 million deal was reported to the Board, "COBA counsel thereafter discovered that there were additional assets available and demanded that Mr. Huberfeld add another million dollars to the deal[.]" (Defendant's Memorandum in Opposition to Motion to Disqualify ("Def. Mem. in Opp.") at 6, Dkt. 48.) On January 24, 2019, Charny and Steier presented and read the revised $7 million settlement agreement to the COBA Annuity Fund Board of Trustees. (*See* Minutes of the Meeting of the Board of Trustees of the [COBA] Annuity Fund Held January 24, 2019 ("Jan. 24, 2019 Board Minutes"), Ex. M to Plaintiff's Letter for Pre-Motion Conference, Dkt. 46-2 at 28 (ECF pagination); *see also* Defendant's Reply Memorandum of Law ("Def. Reply") at 2-3, Dkt. 57.)

***Husamudeen's Travel Gift*** - In early 2019, several Board members learned that a former employee of a COBA vendor gifted Husamudeen a trip that he did not disclose to the Board. (*See* Am. Compl. ¶ 40; Gopal Decl. ¶ 37.) Upon learning of the gift, Board members reported it to the COBA Financial Secretary, who investigated the allegations. (Gopal Decl. ¶¶ 37-38.)

On February 28, 2019, the COBA Financial Secretary sent an email to the Board, referring to the gift as given to Husamudeen "in bad faith," and urging that the matter be "taken seriously and addressed in a timely manner." (*Id.* ¶ 40; Ex. K-3 to *id.*, Dkt. 42-2.) Plaintiff responded, raising the question of whether there was "more than one trip or anything else that was given to Husamudeen." (Gopal Decl. ¶ 41; Ex. K-3 to *id.*)

That same day, Husamudeen informed Plaintiff that he was sending Plaintiff back to work at the RNDC facility. (*See* Am. Compl. ¶ 44; Gopal Decl. ¶ 43.) Although Plaintiff was still assigned to work at RNDC, Plaintiff had been working almost exclusively at the COBA offices. (Am. Compl. ¶¶ 47-48.) Plaintiff told Husamudeen "that he did not have the authority" to send him back to RNDC. (Gopal Decl. ¶ 44.) Defendant Guccione also sent Plaintiff an email informing him that he was to

4

report to RNDC the following day, but COBA's First Vice President subsequently placed Plaintiff on vacation for two months instead. (*Id.* ¶¶ 46-48, 52-53; Am. Compl. ¶ 50.)

***The Rechnitz Payment*** - On December 6, 2019, Plaintiff learned from a New York Daily News article that, in advance of his sentencing hearing, "Jona Rechnitz's attorney wrote in a letter filed in Manhattan Federal Court on Friday that he had [already] paid $240,000 to [COBA]." (Gopal Decl. ¶¶ 90-91 (quoting Ex. K-7 to *id.*, Dkt. 42-2).)

On December 18, 2019, Plaintiff emailed Steier to ask why there had not been "any report on transmission or receipt from the Platinum Claw Back Team" about the payment. (*Id.* ¶ 93; *see* "Dec. 18, 2019 Email," Ex. K-8 to *id.*, Dkt. 42-2.) Steier responded that Plaintiff's "assumptions are unfounded," and explained that an "unsolicited partial payment . . . was found by the receptionist on December 9, 2019—slipped through the mail slot after close of business." (Dec. 18, 2019 Email.) On December 20, 2019, during the Rechnitz sentencing hearing, Husamudeen testified about "the receipt of 'a sizeable check' made by Rechnitz's father." (Gopal Decl. ¶ 107 (citation omitted).)

Plaintiff later learned that on December 15, 2019, Steier wrote a letter to the judge in the Rechnitz matter, reporting the receipt of this partial payment. (*Id.* ¶ 105.)

**The Current Action**

In August or September 2019, Plaintiff retained Fred B. Lichtmacher, Esq., to bring this action against Defendants, alleging that they had retaliated against him. (*Id.* ¶¶ 76-78.) Lichtmacher began working on the case in October 2019 after Plaintiff paid him. (*Id.* ¶¶ 78-80.)

Around the time he was considering bringing this lawsuit, Plaintiff also became concerned about COBA's liability in connection with an ongoing case in Queens County Supreme Court, *Feliciano v. Seabrook*, No. 712894/19, 67 Misc. 3d 1235(A) (Sup. Ct. Queens Cty., June 11, 2020). (*Id.* ¶¶ 81-85; Ex. K-6 to *id.*, Dkt. 42-2.) During a Board conference call in April 2019, Plaintiff asked Charny whether any Board members were vulnerable in the litigation. According to Plaintiff, Husamudeen

instructed Charny not to answer the question until the next meeting. (Gopal Decl. ¶¶ 81-82.) Worried about what he perceived to be a conflict of interest due to Charny's representation of "other Executive Board members," Plaintiff wrote to Steier, requesting conflicts counsel. (*Id.* ¶ 83.) Plaintiff's request was granted, and Plaintiff retained Lichtmacher to act as his conflicts counsel. (*Id.* ¶¶ 84-85.)

On May 12, 2020, Lichtmacher filed the Complaint on behalf of Plaintiff.

On July 17, 2020, Defendant Husamudeen filed his First Motion for Sanctions against Plaintiff and Lichtmacher, alleging that the claims against him alleging violations of 42 U.S.C. § 1983 were frivolous because Husamudeen is a private, not a state, actor. (*See* Memorandum of Law in Support of Defendant Husamudeen's First Motion for Sanctions at 8, Dkt. 13-3.) In support of the motion, Husamudeen submitted, *inter alia*, a declaration signed by him, dated June 18, 2020 (Declaration of Elias Husamudeen ("Husamudeen Decl."), Dkt. 13-1) and a declaration signed by Steier, dated August 5, 2020 (Declaration of Marc Alain Steier ("Steier Decl."), Dkt. 18-2).

As relevant to this Decision, Steier stated in his declaration, "As [Plaintiff] is aware, since it was reported to him soon thereafter and is reflected in his own exhibit (Dkt. 16-2), this check [for $240,000] was made out *by a relative* to Mr. Rechnitz." (Steier Decl. ¶ 18 (emphasis in original).)

As relevant here, Husamudeen stated in his declaration that he "ha[s] it upon information and belief that [Plaintiff's] attorney is under the misapprehension that merely naming attorneys Charny, Isaacs, Steier and O'Hara in the complaint would deprive [Husamudeen] of their counsel." (Husamudeen Decl. ¶ 5.)

On November 19, 2020, Lichtmacher filed a motion to withdraw as counsel, stating that he and Plaintiff had irreconcilable differences. (*See* Dkt. 24.) During a conference on November 30, 2020, the Court urged Plaintiff and Lichtmacher to try to resolve their communication issues and suggested guidelines to enable Lichtmacher's continued representation. Plaintiff and Lichtmacher

6

agreed to try to repair their relationship, and Lichtmacher withdrew his motion.  (Min. Entry dated Nov. 30, 2020.)

On December 17, 2020, the Honorable LaShann DeArcy Hall held a pre-motion conference by telephone on Defendants' anticipated motion to dismiss the complaint (the "Dec. 17, 2020 Conference").  Charny appeared on behalf of Husamudeen, and Steier was present.  Although he had not filed a notice of appearance, Steier interrupted Lichtmacher's argument regarding substantive due process (Gopal Decl. ¶¶ 142-43), stating that Lichtmacher was "almost 180 degrees wrong," "going down a rabbit hole," and he "just want[ed] to stop him before he gets too, you know—[.]"  (*Id.* ¶ 146 (quoting Dec. 17, 2020 Tr. ("Tr.") 18:16-21, Ex. K-17 to *id.*, Dkt. 42-2).)  Judge DeArcy Hall stopped Steier and stated that she would hear Defendants' argument after Lichtmacher was finished.  (*Id.* ¶ 148.)  Lichtmacher then explained that the substantive due process claim involved the lack of masks and personal protective equipment in the jail where Plaintiff worked.  (Tr. 19:2-11, Ex. 1 to Declaration of Nathaniel K. Charny ("Charny Decl."), Dkt. 49-1.)[1]  At the end of the conference, the parties were directed to confer and agree on the date by which Plaintiff would file an amended complaint.  (Min. Entry dated Dec. 17, 2020.)

On January 29, 2021, Plaintiff filed the Amended Complaint.  (Dkt. 28.)

On February 23, 2021, Lichtmacher renewed his motion to withdraw as Plaintiff's counsel, stating that his relationship with Plaintiff "suffered an irreparable breakdown."  (Dkt. 35.)  On March 16, 2021, the Court granted Lichtmacher's motion to withdraw as counsel.

On March 31, 2021, the First Motion for Sanctions was denied, in light of the filing of the Amended Complaint.  (*See* Order dated Mar. 31, 2021.)

---

[1] Plaintiff includes excerpts from the Dec. 17, 2020 Tr. as Exhibit K-17 to the Gopal Declaration but omits the page following Steier's interruption of Lichtmacher.  That page appears in the transcript appended to Charny's Declaration.  (*See* Dkt. 49-1.)

On May 9, 2021, Gopal entered a notice of appearance on behalf of Plaintiff. (Dkt. 40.) On May 19, 2021, Plaintiff filed the Motion to Disqualify Charny and his firm from representing Defendant Husamudeen.

On June 1, 2021, Husamudeen sent Plaintiff's counsel a letter informing her that he intended to file a motion for Rule 11 sanctions based, *inter alia*, on statements contained in the Motion to Disqualify. (*See* "Safe Harbor Letter," Ex. 5 to Defendant's Memorandum of Law in Support of Motion for Sanctions ("Def. Mem. of Law in Supp."), Dkt. 52-2.) He supplemented that notice on June 3, 2021 with a second letter. ("Second Safe Harbor Letter," Ex. M to Plaintiff's Letter for Pre-Motion Conference at 14 (ECF pagination), Dkt. 46-2.) After Plaintiff declined to withdraw the statements, Defendant Husamudeen filed the Motion for Sanctions on July 15, 2021. [2]

## DISCUSSION

### I.   PLAINTIFF'S MOTION TO DISQUALIFY

#### A.   Request for Disqualification of Charny

Citing to Rule 1.7(a) of the New York Rules of Professional Conduct, Plaintiff claims that Charny was so deeply involved in the misconduct alleged in this case that he has "overriding personal interests at stake in this litigation" (Plaintiff's Memorandum of Law in Support of Motion to Disqualify ("Pl. Mem. of Law in Supp.") ¶¶ 1-2, Dkt. 42-3) and that he "represents differing interests." (*Id.* ¶¶ 9-12.) Plaintiff also raises the specter that Charny will act as an "unsworn witness" at trial. (*Id.* ¶¶ 7-8.) Finally, Plaintiff contends, without reference to a specific rule, that Charny's representation

---

[2] Husamudeen filed his Memorandum of Law in Support of the Motion for Sanctions on July 15, 2021 (Dkt. 52-1), but it exceeded page-length requirements. Thus, he filed a shorter version on August 2, 2021, which is within the page limits. (*See* Dkt. 57-1.) The Court relies on the latter-filed version of the Memorandum of Law.

of Husamudeen "is a per se conflict of interest" (*id.* ¶¶ 13-17) and that Charny "has access to privileged documents across numerous clients." (*Id.* ¶¶ 18-19.)[3]

### 1. *Legal Standard*

A federal court may exercise its discretion in disqualifying counsel. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). The power to disqualify an attorney derives from a federal court's "inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). While state disciplinary rules "need not be rigidly applied" in determining whether disqualification is warranted, they provide guidance for the court when resolving a motion for disqualification. *John Wiley & Sons, Inc. v. Book Dog Books, L.L.C.*, 126 F. Supp. 3d 413, 419 (S.D.N.Y. 2015); *see Hempstead Video*, 409 F.3d at 132.

In general, "[d]isqualification is viewed 'with disfavor in this Circuit', . . . because it impinges on a 'client's right freely to choose his counsel.'" *Finkel v. Frattarelli Bros., Inc.*, 740 F. Supp. 2d 368, 372 (E.D.N.Y. 2010) (first quoting *Bennet Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y. 1991); then quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983)). "[T]he Second Circuit has noted the 'high standard of proof' required for disqualification motions because, among other things, they are 'often interposed for tactical reasons,' and 'even when made in the best of faith, such motions inevitably cause delay.'" *Id.* (quoting *Evans*, 715 F.2d at 791-92 (citation omitted)). The moving party, therefore, bears a heavy burden to prove that disqualification is appropriate. *Rizzuto v. De Blasio*, No. 17-CV-7381 (ILG)(ST), 2019 WL 1433067, at * 2 (E.D.N.Y. Mar. 29, 2019).

---

[3] In his Reply Memorandum in Support of the Motion to Disqualify, Plaintiff raises for the first time that Charny should be disqualified pursuant to a "substantial relationship" test, as well as Canons 4, 5, and 9 of the New York Lawyer's Code of Professional Responsibility. ("Pl. Reply," Dkt. 51-1.) Because these legal arguments appear for the first time in Plaintiff's Reply, the Court does not consider them. *See Thomas v. Roach*, 165 F.3d 137, 145-46 (2d Cir. 1999).

## 2. *Disqualification under Rule 1.7(a)* [4]

Rule 1.7(a) of the New York Rules of Professional Conduct provides that, except as provided in subsection (b)[5]:

> A lawyer shall not represent a client if a reasonable lawyer would conclude that either (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

Under subsection (1) of Rule 1.7(a), it is considered "prima facie improper" for an attorney to simultaneously represent clients with interests directly adverse to one another. *See Pierce & Weiss, L.L.P. v. Subrogation Partners L.L.C.*, 701 F. Supp. 2d 245, 251 (E.D.N.Y. 2010) (citations omitted). Under subsection (2), "the mere existence of financial or business interests does not warrant disqualification. Rather, there must be a 'significant risk' that these interests will 'adversely affect[ ]' the lawyer's exercise of professional judgment on behalf of the client." *Power Play 1, L.L.C. v. Norfolk Tide Baseball Club, L.L.C.*, No. 17-CV-4831, 2017 WL 5312193, at *4 (S.D.N.Y. Nov. 13, 2017) (citing N.Y. Rules of Pro. Conduct 1.7(a)(2)).

Disqualification pursuant to Rule 1.7, which deals with concurrent conflicts of interest, is warranted "only in essentially two kinds of cases: (1) where an attorney's conflict of interests . . . undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation." *Id.* at *3 (quoting *Cohen v. Strouch*, No. 10-

---

[4] The New York Rules of Professional Conduct, which were revised and implemented on April 1, 2009, replaced the old Canons and Disciplinary Rules. "Even though the Canons have been replaced by the New York Rules of Professional Conduct, the new rules still incorporate much of the substance of the old rules. Therefore, much of the precedent interpreting the old rules still remains applicable." *Pierce & Weiss, L.L.P., v. Subrogation Partners L.L.C.*, 701 F. Supp. 2d 245, 251 (E.D.N.Y. 2010) (citations omitted).

[5] Rule 1.7(b) requires, *inter alia*, that "each affected client gives informed consent, confirmed in writing," and is not applicable here.

CV-7828 (DLC), 2011 WL 1143067, at *1-2 (S.D.N.Y. Mar. 24, 2011) (citation omitted)). Except in unusual circumstances, the mere appearance of impropriety is insufficient to disqualify an attorney. *Paramount Commc'ns, Inc. v. Donaghy*, 858 F. Supp. 391, 394 (S.D.N.Y. 1994) (citation omitted). "[T]he party seeking disqualification must offer more than vague and conclusory allegations to meet its burden" of demonstrating that a conflict of interest exists. *Power Play*, 2017 WL 5312193, at *3.

### a.   *A Lawyer's Personal Interests Under Rule 1.7(a)(2)*

Plaintiff argues primarily that Charny is impermissibly conflicted because of his personal involvement in "irregular and suspicious activities" while acting as counsel to COBA, and that he is using his position as Defendant Husamudeen's lawyer to cover them up. (Pl. Mem. of Law in Supp. ¶¶ 3-6.) Plaintiff attributes sinister motives to Charny for representing Husamudeen, including that he is trying to protect information "through the establishment of an illegitimate attorney-client relationship" and "to use illicit means to protect himself and any potential accomplices from criminal liability." (*Id.* ¶¶ 12, 18.) He even speculates that "if Charny and Husamudeen were conducting criminal acts, then Charny may have an interest in entering into civil litigation as Husamudeen's attorney to create a ruse by which he might further conceal any criminal conduct." (*Id.* ¶ 5.)

Plaintiff's arguments rest on conjecture and speculation, with no evidentiary support. He fails to identify what criminal conduct Charny has engaged in. Plaintiff submits no sworn affidavits, only a purported "Factual Declaration" signed by Gopal. While several exhibits are attached to the declaration, none provide <u>factual</u> support for wrongdoing by Charny. Even Plaintiff's descriptions of purported wrongdoing do not implicate Charny. Plaintiff does not describe how Charny had any role in the handling of Husamudeen's suspicious gifts or the decision to send Plaintiff back to RNDC. Plaintiff's complaints about the Rechnitz payment involve communications with Steier, not Charny; Charny is only copied on an email from Steier about the Rechnitz payment. (*See* Dec. 18, 2019 Email.) With regard to the Huberfeld clawback deal, Plaintiff alleges that Charny and Steier were responsible

11

for the explanation of why the deal was presented as a $6 million deal and then as a $7 million deal. However, Plaintiff has provided no basis for how this constituted misconduct by Charny.

Far from presenting "a clear and undeniable picture of foul play and misconduct," (Pl. Mem of Law in Supp. ¶ 26), Plaintiff presents a muddled and unsupported series of accusations.

An impermissible personal interest stemming from avoiding litigation has been found in cases where disputed attorneys have already been implicated in an investigation or other proceeding. *See Mura v. Thomas*, 19-CV-8699 (LMS), 2020 WL 2086039, at *6-7 (S.D.N.Y. Apr. 30, 2020) (finding an impermissible self-interest where attorneys are defending a civil action brought by opposing party in current case, in which the attorneys are alleged to have received funds they knew to be stolen); *see also Fed. Ins. Co. v. PixarBio Corp.*, No. 20-CV-4659 (GBD), 2022 WL 623735, at *7 (S.D.N.Y. Mar. 3, 2022) (finding clear conflict where law firm was notified the SEC was investigating it, along with its clients).

Here, however, there is no investigation or prosecution against Charny.

Absent concrete allegations or an ongoing investigation, merely raising the possibility that wrongdoing could be uncovered does not create a conflict. "Conjecture about . . . possible future malpractice claims is not sufficient to withstand the scrutiny under which a court must analyze disqualification motions." *Finkel*, 740 F. Supp. 2d at 379; *see, e.g.*, *Cadle Co. v. Damadeo*, 256 F. Supp. 2d 155, 157 (E.D.N.Y. 2003) (denying motion to disqualify where movant provided "only conclusory allegations" as evidence of conflict of interest); *Sea Tow Int'l, Inc. v. Pontin*, No. 06-CV-3461 (SJF)(ETB), 2007 WL 4180679, at *6 (E.D.N.Y. Nov. 19, 2007) (conclusory assertions that General Counsel possibly committed malpractice "amount to nothing more than sheer speculation as to the existence of a conflict of interest" and "merely bolster the argument that this motion is being made solely to achieve a strategic advantage in this litigation").

Plaintiff relies on criminal cases for the proposition that "where there is reason to believe that the attorney would be more concerned about his own personal reputation and the possibility that he

might be accused of a crime than he would about the interests of his client than [sic] the attorney should be disqualified."  (Pl. Mem. of Law in Supp. ¶ 2); *see, e.g., United States v. Jones*, 381 F.3d 114 (2d Cir. 2004); *United States v. Perez*, 325 F.3d 115 (2d Cir. 2003).  In those criminal cases, the courts were considering whether a conflict was waivable in the context of the government seeking disqualification of defense counsel based on a concern that a defendant could successfully appeal a conviction based on ineffective assistance of counsel.

Here, Plaintiff fails to identify any conflict at all.  The allegations of criminal conduct emanate from Plaintiff himself and lack any basis.  *Cf. United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002) (disqualified attorney had a financial interest, due to his representation of another client, that was directly adverse to his client's interest); *United States v. Fulton*, 5 F.3d 605 (2d Cir. 1993) (defendant's attorney disqualified in drug conspiracy case where government witness implicated the attorney in heroin importation).

Plaintiff's paucity of proof is highlighted by his attempt to attribute actions by Lichtmacher to direction from Charny and Steier, in order to suggest improper conduct by Charny.  For example, Plaintiff alleges that Lichtmacher was in "regular contact" with Charny and Steier during his early representation of Plaintiff in this action, which he speculates led to Lichtmacher's undertaking of the role of conflicts counsel without pay from COBA.  (Gopal Decl. ¶ 86.)  However, Plaintiff admits that he has <u>no</u> evidence of impropriety, stating, "Plaintiff cannot assert why Lichtmacher did this but suspects foul play, in retrospect."  (*Id.* ¶ 88.)

Plaintiff also seeks to attribute perceived defects in the Complaint to direction from Charny and Steier, alleging that Lichtmacher "file[d] a skillfully frivolous complaint that was very likely filed-to-fail" (*id.* ¶¶ 111-12) and that "around the time Lichtmacher came into contact with Steier and Charny, Lichtmacher began delaying filing Plaintiff's case" and taking other actions that were not in Plaintiff's interest.  (*See id.* ¶¶ 113-22.)  Plaintiff states that "[t]he manner of Lichtmacher's amendment

[of the Complaint] raises serious questions about who Lichtmacher was taking instructions from—as he was certainly not taking instructions from his client, Plaintiff." (*Id.* ¶ 138.) Plaintiff even goes so far as to imagine that during the Dec. 17, 2020 Conference, Steier was "directing Lichtmacher's oral arguments," because when Steier interrupted him, Lichtmacher subsequently pivoted from speaking about substantive due process to talking about COVID-19.[6] (*Id.* ¶¶ 141-55.)

While Plaintiff was unhappy with the legal services Lichtmacher provided—and dissatisfaction with that relationship was clearly mutual, as evidenced by Lichtmacher's attempts to be relieved as counsel—Plaintiff's suspicions of a conspiracy between his counsel and opposing counsel are nothing more than fanciful musings.

  *b.  Differing Interests Under Rule 1.7(a)(1)*

A lawyer may be disqualified from representing a client if the "representation will involve the lawyer in representing differing interests." N.Y. Rules of Pro. Conduct 1.7(a)(1). Rule 1.7 applies when representation is concurrent, rather than successive. *See Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 389 (S.D.N.Y. 2010).

Plaintiff argues that Charny's representation of Husamudeen creates a "per se conflict of interest," but does not specify where the conflict lies.[7] (Pl. Mem. of Law in Supp. ¶¶ 13-17.) Plaintiff seems to posit that there is a conflict between Charny's representation of Husamudeen and some

---

[6] Plaintiff's assertion that Steier's interruption caused Lichtmacher to "not pick up where he left off with his argument" and "[i]nstead [ ] jump[ ] straight into his COVID theory" is also inaccurate. (*See* Gopal Decl. ¶ 148.) Plaintiff's fourth cause of action alleges a substantive due process claim that hinges on Defendants failing to provide Plaintiff and other employees with adequate personal protective equipment due to the COVID-19 pandemic. (*See* Compl. ¶¶ 271-81; Am. Compl. ¶¶ 126-37.) Although Plaintiff contends that he did not want Lichtmacher to advance the argument relating to COVID-19 (Gopal Decl. ¶¶ 116-24), there is no evidence that Lichtmacher changed course from a substantive due process argument to something else. It was essentially the same argument.

[7] Plaintiff does not, and cannot, argue that an attorney-client relationship exists between Charny and himself, because Charny does not represent Plaintiff as a member of COBA. Plaintiff is separately represented by conflicts counsel.

unnamed duty that he purportedly has to COBA, stating, "information pertaining to representation of Husamudeen is privileged because of the establishment of an attorney-client relationship with Husamudeen.  On the other hand, Charny very likely has a fiduciary obligation especially to COBA funds."  (*Id.* ¶ 11.)  Plaintiff does not explain the basis for his belief that Charny has such a legal obligation.   He also does not present proof that Charny currently represents COBA; the only connection Plaintiff describes is Charny's prior involvement in COBA's clawback efforts.  Rather than presenting factual support for an alleged conflict, Plaintiff asks hypothetically, "What happens when Charny is confronted with evidence of Husamudeen's malfeasance against COBA?" and provides the conclusory answer that "Charny is at an impasse and has not [sic] ethical path forward."  (*Id.*)

Plaintiff also seems to refer to a lawyer's duty to clients in successive representations when he argues that Charny will use privileged information gleaned from the COBA entities to "devise protection for Husamudeen and himself, against the best interests of his former clients the COBA funds, bodies and entities[.]"  (*Id.* ¶ 19.)  However, Plaintiff does not cite or apply New York Rules of Professional Conduct Rule l.6, which deals with successive representation.[8]  *See Revise Clothing*, 687 F. Supp. 2d at 388–89 (noting question of whether attorney had access to privileged information is part of successive representation analysis and is "grounded in the ethical requirement that an attorney protect client confidences . . . a duty articulated in Rule 1.6").  And, rather than engaging in any analysis under Rule 1.6, Plaintiff again falls back on his argument that Charny will misuse the privileged information to protect primarily himself: "Wrapped in layers of conflicting privilege, it can be no coincidence that Charny finds himself in an ideal position to use illicit means to protect himself and any potential accomplices from criminal liability."  (Pl. Mem of Law in Supp. ¶ 18.)

---

[8] In his Reply, Plaintiff contends that he meets the "substantial relationship" test, without acknowledging its applicability to Rule 1.6.  *See, e.g.*, *Revise Clothing*, 687 F. Supp. 2d at 389, 392-94 (finding no substantial relationship between subject matter of prior litigation and current case as required for disqualification under Rule 1.6).

Finally, Plaintiff asserts that "Defendant Husamudeen would be wise not to choose Attorney Charny as counsel." (Pl. Reply at 5 (ECF pagination).) However, Husamudeen has not asked to disqualify Charny or replace him as his lawyer, and Plaintiff asserts no legal basis for depriving Husamudeen of his choice of counsel.

### 3. "Unsworn Witness"

Plaintiff also argues that Charny must be disqualified because he has "first-hand experience of the most important of facts that underlie Plaintiff's case[,]" and will therefore act as an "unsworn witness" at trial. (Pl. Mem. of Law in Supp. ¶ 7.)

The "unsworn witness" rule is usually applied in criminal cases in situations where opposing counsel and a witness each have first-hand knowledge of an event to be presented at trial, such that the lawyer can "suggest to the jury during examination of the witness or during summation that counsel was a witness to the event and that his version of the facts is more trustworthy than the witness's version." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Roper, Inc.*, No. 95-CV-8833 (RPP), 2000 WL 1655054, at *5 (S.D.N.Y. Nov. 3, 2000). The concern is that he "can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993).

Disqualification of an attorney due to firsthand knowledge of his or her client's conduct is a drastic remedy, reserved for "unusual" cases. *See id.* at 934; *see also Matthews v. LeBoeuf*, 902 F. Supp. 26, 29 (S.D.N.Y. 1995). In *Locascio*, for example, the Second Circuit found disqualification was warranted where the attorney "allegedly entangled himself to an extraordinary degree in the activities of the [organized crime family]." 6 F.3d at 934. There, the attorney was recorded on government tapes during discussions of allegedly illegal activity, he was alleged to be involved in a tax fraud count against one of the defendants, his role as "house counsel" could be used to prove the criminal

enterprise, and his representation of government witnesses conflicted with his representation of a defendant. *See id.*

Here, notwithstanding his invocation of the unsworn witness rule, Plaintiff explicitly states that his "concern is not that Charny's first-hand experience gives him an unfair advantage. Rather, [his] concern is about Charny's tendency to misuse information, as he has already done in two filings." (Pl. Mem. of Law in Supp. ¶ 8). However, Plaintiff has not shown that Charny has misused any information, and counsel's alleged "tendency to misuse information" is not a component of the unsworn witness rule. Plaintiff states no other legal justification for disqualifying counsel on the basis of this rule.

Accordingly, the Court finds no basis to disqualify Charny from representing Defendant Husamudeen.

## B. <u>Request That Charny Be Further Investigated</u>

Plaintiff urges the Court to begin its own investigation into Charny's alleged misconduct, or to refer Plaintiff's allegations for investigation by law enforcement or bar associations.

Because the Court finds no evidence that Charny engaged in misconduct or violations of any disciplinary rules, let alone any criminal conduct, it finds no reason to investigate or refer this matter for criminal investigation or disciplinary proceedings. *See Pullman v. Alpha Media Pub., Inc.*, No. 12-CV-1924 (PAC)(JCF), 2012 WL 3114939, at *6 (S.D.N.Y. July 31, 2012) (declining to refer case to Attorney General for criminal investigation, or to New York Bar for disciplinary proceedings, because plaintiff failed to establish any misconduct by defendants); *see also Ideal Steel Supply Corp. v. Anza*, No. 02-CV-4788 (RMB)(AJP), 2013 WL 6912681, at *4 (S.D.N.Y. Dec. 23, 2013) (acknowledging potential questionable conduct but declining to refer civil case for criminal investigation).

Accordingly, the Court declines to investigate Charny's alleged misconduct or refer the matter for criminal investigation or disciplinary proceedings.

Plaintiff's Motion to Disqualify is denied in its entirety.

## II.   MOTION FOR SANCTIONS

Defendant Husamudeen seeks sanctions against Plaintiff and his counsel pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C § 1927, and 42 U.S.C § 1988, arguing that Plaintiff's Motion to Disqualify contains "frivolous and baseless allegations."  (Def. Mem. of Law in Supp. at 1, 8.)

### A.   <u>Sanctions Pursuant to Rule 11</u>

#### 1.   *Legal Standard*

Rule 11 is violated when either "it appears that a pleading has been interposed for any improper purpose, *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law."  *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 705–06 (2d Cir. 1990) (emphasis in original) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on other grounds by Rule as stated in Sorenson v. Wolfson*, 633 F. App'x 33, 35 (2d Cir. 2017)).  To determine whether a violation exists, "courts evaluate the objective reasonableness of the pleading's allegations at the time the pleading was signed."  *Cavanagh v. Ford Motor Co.*, No. 13-CV-4584 (JS)(SIL), 2015 WL 13745259, at *4 (E.D.N.Y. Dec. 4, 2015) (citing *Asbeka Indus. v. Travelers Indem. Co.*, 831 F. Supp. 74, 90 (E.D.N.Y. 1993)).  All doubts in the pleading are resolved in favor of the signer.  *Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150, 163 (E.D.N.Y. 2006) (citation omitted).  "[R]ule 11 is violated only when it is 'patently clear that a claim has absolutely no chance of success.'"  *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986) (quoting *Eastway*, 762 F.2d  at 254). [9]

---

[9] Sanctions may be imposed for the filing of a frivolous pleading, motion, or other paper.  *See* Fed. R. Civ. P. 11.

"Rule 11 requires that factual allegations presented to the court 'have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.'" *Kingvision Pay-Per-View Ltd. v. Ramirez*, No. 05-CV-2778 (HB), 2005 WL 1785113, at *3 (S.D.N.Y. July 28, 2005) (quoting Fed. R. Civ. P. 11(b)(3)). While "[a]ttorneys may, when reasonable, rely on what their clients tell them to support a claim . . . . an attorney may not base an allegation solely on a client's representation if it is objectively unreasonable to believe that the representation could support the allegation." *Goldman v. Barrett*, 825 F. App'x 35, 38 (2d Cir. 2020); *Saltz v. City of New York*, 129 F. Supp. 2d 642, 646 (S.D.N.Y. 2001) ("[W]hen an attorney must rely on his client, he should question him thoroughly, not accepting his version on faith alone . . . . '[I]f all the attorney has is his client's assurance that facts exist or do not exist, when a reasonable inquiry would reveal otherwise, he has not satisfied his [Rule 11] obligation.'" (alteration in original) (citations omitted)); *cf. Wigton v. Rosenthall*, 137 F.R.D. 4, 5 (S.D.N.Y. 1991) (finding prefiling inquiry reasonable where counsel did not rely solely on client's explanation but had independent documentary and testimonial support); *Carlton Grp., Ltd. v. Tobin*, No. 02-CV-5065 (SAS), 2003 WL 21782650, at *7 (S.D.N.Y. July 31, 2003) (finding prefiling inquiry reasonable where attorney relied in part on expert's findings to support allegations). Failure to verify factual allegations may constitute a prima facie violation of Rule 11(b)'s requirement of reasonable inquiry. *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 408 n.28 (S.D.N.Y. 2009) (finding "false and scandalous" allegation that defendant was convicted of criminal contempt, based on newspaper article alone "with no effort made to verify through judicial records," was a prima facie violation of Rule 11(b)'s requirement of reasonable inquiry), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

Sanctions may be imposed "for filing a claim containing frivolous legal arguments or factual allegations utterly lacking in evidentiary support." *See Pasqualini v. MortgageIT, Inc.*, No. 05-CV-9714 (LAP), 2009 WL 2407651, at *17 (S.D.N.Y. Aug. 5, 2009); *see also Muhammad v. Walmart Stores E., L.P.*,

732 F.3d 104 (2d Cir. 2013) ("Under Rule 11, a court may sanction an attorney for, among other things, misrepresenting facts or making frivolous legal arguments." (citation omitted)).

### 2. *Analysis*

Husamudeen argues that the following allegations by Plaintiff are baseless and frivolous:  (1) that Charny knowingly submitted false declarations by Steier and Husamudeen, which contained false statements (Def. Mem. of Law in Supp. at 1-4), (2) that Charny and Steier were working with Lichtmacher to sabotage Plaintiff's case (*id.* at 4), and (3) that Charny and Steier were involved in "suspicious activities."  (*Id.* at 5-7.)

As a preliminary matter, the Court finds that Husamudeen complied with the procedural requirements of a Rule 11 motion by sending the Safe Harbor Letter to Plaintiff's counsel, thereby putting her on notice that Husamudeen considered several of the contentions in her Declaration to lack evidentiary support.[10]

The Court agrees with Husamudeen that Plaintiff's above-mentioned assertions are frivolous and lacking in evidentiary support.  Despite the submission of various exhibits, it is also apparent that Plaintiff's counsel did not engage in additional inquiry into her client's unsupported assertions and conjectures.

#### a.  *Allegations of False Declarations*

In his Motion to Disqualify, Plaintiff states that "Charny knowingly submitted declarations containing material misrepresentations, omissions and falsehoods in the name of Defendant Husamudeen … and Mark Steier," referencing the Steier Declaration and Husamudeen Declaration.

---

[10]  The purpose of the safe harbor provision is "to give the opponent notice and an opportunity to consider withdrawing the filing without the court's involvement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012).  Plaintiff manages to turn this safe harbor requirement into something nefarious, accusing Defendant of having served sanction papers that "contained several falsehoods that could only be intended to wrongfully cause (or even intimidate) Plaintiff's counsel to remove Plaintiff's valid and reasonable allegations from the record in this case."  ("Pl. Mem. of Law in Opp." at 2, Dkt. 54-1.)

(Pl. Mem. of Law in Supp. ¶ 6; *see* Gopal Decl. ¶¶ 125-41.)[11]   Specifically, Plaintiff points to the statement in the Steier Declaration, that "it was reported to [Plaintiff] soon thereafter" that the Rechnitz check was made out by a relative of Rechnitz.  (Gopal Decl. ¶ 25 (quoting Steier Decl. ¶ 18).)  Plaintiff contends that Steier's statement is false, "find[ing] it rather misleading for Steier to characterize his December 18, 2019 email response to Plaintiff as a 'report' made to Plaintiff 'soon thereafter.'"  (*Id.* ¶ 128.)

The Court finds Plaintiff's allegation of falsehood frivolous.  The Steier Declaration does not characterize the December 18, 2019 Email as a "report."  Rather, it describes that email as having conveyed information to Plaintiff—that is, reported to him—about the circumstances under which the Rechnitz check was received by COBA.  There is also no inaccuracy to the statement that the information was conveyed "soon thereafter," when Plaintiff raised his concern nine days after COBA's receipt of the check, and Steier responded to his email less than two hours later.

In addition, Plaintiff describes as "alarming[ ]" Husamudeen's statement that "Husamudeen has it 'under information and belief that [Plaintiff's] attorney is under the *misapprehension* that merely naming attorneys Charny, Isaacs, Steier and O'Hara in the complaint would deprive [Husamudeen] of their counsel.'"  (Gopal Decl. ¶ 136 (quoting Husamudeen Decl. ¶ 5 but adding emphasis).)  Plaintiff alleges that "Husamudeen makes the above declarations under the penalty of perjury while having reason to know that Plaintiff's claims were based on his good faith reporting of serious ethical and potentially criminal failings on the part of the Platinum Claw Back Team."  (*Id.* ¶ 141.)

Husamudeen contends that Plaintiff's counsel's characterization of this statement as false is frivolous.  (Def. Mem. of Law in Supp. at 3.)  The Court agrees.  Plaintiff describes the Husamudeen Declaration as one of the "False Declarations Made By, Through, or in Favor of Charny."  (Gopal

---

[11] Plaintiff's argument that Steier directed Lichtmacher's oral argument is also under the heading "False Declarations," but the Court considers it separately as Plaintiff does not explain what the "false declaration" is. (*See* Gopal Decl. ¶ 34.)

Decl. at 30.)  However, Plaintiff has not explained which part of the statement is not true, nor has he provided any facts to show how Husamudeen's statement about Lichtmacher's legal belief is false. Indeed, Plaintiff argues that Husamudeen's statement supported Plaintiff's contention that Lichtmacher was deliberately providing ammunition for Husamudeen to attack his case and "best illustrates how Lichtmacher's representation of Plaintiff only served to give strength to Charny and Husamudeen." (*Id.* ¶ 135.)

### b.   *Allegations of Collusion with Lichtmacher*

As detailed *supra*, Plaintiff's allegations that Charny and Steier colluded with Lichtmacher against Plaintiff are objectively unreasonable and devoid of evidentiary support.  In particular, Husamudeen calls out Plaintiff's allegation that Steier somehow successfully "directed" Plaintiff's counsel's oral argument during the Dec. 17, 2020 Conference.  (*See* Def. Mem. of Law in Supp. at 4; Gopal Decl. ¶¶ 142, 151, 153.)  Plaintiff's argument is speculative and based on suspicions of foul play rather than fact.  Plaintiff's allegations that Steier and Charny are responsible for any deficiencies in Lichtmacher's filed complaint are equally without merit.

### c.   *Allegations of Involvement in "Suspicious Activities"*

Finally, Plaintiff's allegations that Charny and Steier committed malfeasance with regard to the Huberfeld clawback deal and Rechnitz payment also lack evidentiary support.

Husamudeen argues that Plaintiff's counsel should be sanctioned for the baseless accusations that Charny and Steier committed unnamed malfeasance regarding the restitution amount of the Huberfeld clawback deal.  (Def. Mem. of Law in Supp. at 5-6.)  As discussed *supra*, Plaintiff's allegations that Charny, along with Steier, engaged in potentially criminal conduct are based on speculation rather than any facts.

Plaintiff claims that the Board voted only to approve a $6 million deal (Gopal Decl. ¶¶ 21, 26-33), and that despite a promise to present a resolution for a $7 million deal, "no such resolution was

presented to the Executive Board in Plaintiff's presence," seeming to imply that there was malfeasance relating to the $1 million discrepancy.  (*Id.* ¶¶ 32-33.)

Steier points out, however, that Plaintiff was at the Board meeting where the $7 million deal was discussed and voted on (Steier Decl. ¶ 15), but that he "voluntarily left and did not return" to the meeting when the restitution agreement "was debated and approved by the Executive Board." (Safe Harbor Letter at 5 n.3.)  Plaintiff calls Steier's statement in the Steier Declaration to that effect "plainly false," adding that "Steier had good reason to know it was false, and likely intentionally advanced the statement to mislead this Court and cover up a crime." (Gopal Decl. ¶ 36.)  Plaintiff provides no evidence, however—not even an affidavit from Plaintiff—to contradict Steier's statement that Plaintiff left the meeting and that the Board did discuss the $7 million agreement.  Without evidentiary support, Plaintiff's assertion that Steier was lying remains purely speculative.

Even if Plaintiff's counsel was not aware at the time the Motion to Disqualify was filed that the $7 million agreement had been presented to the Board, Rule 11 imposes a duty on counsel to correct an allegation upon discovery that it is incorrect.  *See* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ("[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.").

Here, the record shows that Plaintiff was clearly aware of evidence that the $7 million deal was presented to the Board, because on June 17, 2021, Plaintiff filed a letter requesting a pre-motion conference on his anticipated motion to amend the complaint and attached the Second Safe Harbor Letter, which included the January 24, 2019 Board Minutes indicating that the $7 million settlement agreement was presented and discussed.  (Jan. 24, 2019 Board Minutes; *see also* Def. Reply at 2-3.) Despite this information undermining Plaintiff's theory of a cover-up, Plaintiff persisted in alleging

that Steier and Charny engaged in potentially criminal conduct based on vague insinuations that information was withheld from the Board.

Plaintiff opposes the Motion for Sanctions, arguing that his allegations in the Motion to Disqualify are "narrow" and that Husamudeen "wrongly describe[s] what Plaintiff carefully presents as realistic possibilities of illicit activity as bald claims of crime." (Pl. Mem. of Law in Opp. at 5, Dkt. 54-1.) He attempts to characterize his claims as "only that any reasonable person apprised of the factual context of [the Steier Declaration] . . . would likely conclude from impugned statements an intention to mislead the court and cover up a crime." (*Id.*) He also contends that issues such as whether Plaintiff "admonished" Charny and Steier for failing to promptly report the increased value of the Huberfeld clawback deal to the Executive Board are merely "factual disputes" for a factfinder to resolve. (*Id.* at 6.)

Given that Plaintiff presents <u>no</u> facts—only speculation—to support his accusations that Charny, Steier and Husamudeen submitted false statements to the Court and that Charny and Steier engaged in potentially criminal conduct, there are no material factual disputes to resolve. And even accepting the facts that Plaintiff presented—such as that Plaintiff "admonished" Charny and Steier— they would not constitute evidence that Charny and Steier engaged in making false statements or a criminal cover-up.

Contrary to Plaintiff's characterization of his arguments, he has gone beyond raising "realistic possibilities of illicit activity" and, instead, made clear statements that Steier and Charny engaged in criminal conduct. (*See, e.g.*, Pl. Reply at 8 (ECF pagination) ("Plaintiff has put on record evidence that Attorney Charny made falsified records and reports to COBA in events and transactions central to Plaintiff's claims."); Pl. Mem. of Law in Supp. ¶ 18 ("Wrapped in layers of conflicting privilege, it can be no coincidence that Charny finds himself in an ideal position to use illicit means to protect himself and any potential accomplices from criminal liability."); Gopal Decl. ¶ 36 ("Steier . . . likely

intentionally advanced the statement to mislead this Court and cover up a crime.").) Plaintiff's request that the Court refer this matter to prosecutors for investigation into possible criminal conduct serves as accusation enough by Plaintiff.

As for the Rechnitz payment, Plaintiff hints repeatedly at misdeeds by Charny and Steier without identifying what they are. For example, with regard to the December 18, 2019 Email, Plaintiff states that "Steier does not record the amount of money received. Moreover, Steier also seems to be deliberately creating a misleading record, having reason to know that Plaintiff was actively monitoring and reporting suspect activity." (Gopal Decl. ¶ 95.) Plaintiff describes the circumstances "surrounding so-called 'discovery' of [the $240,000] check" as "insalubrious." (*Id.* ¶ 96.) However, the Court agrees with Husamudeen that it is "difficult to discern" what Plaintiff is alleging. (*See* Def. Mem. of Law in Supp. at 6.)

Plaintiff suggests that Steier did not actually submit a letter to the court in December 2019 acknowledging receipt of the Rechnitz payment, because the letter did not appear on Rechnitz's criminal docket at the time. (Gopal Decl. ¶¶ 100-02; s*ee* Ex. K to Plaintiff's Letter, Dkt. 34-11.) Husamudeen explains, however, that "COBA did not appear on the docket as an 'interested party' through counsel . . . until February 27, 2020 and as such did not have access to the docket [to post the letter] until that date." (Def. Reply at 4 n.4.) Plaintiff does not dispute this.

Because Plaintiff cites no basis for his insinuation that Charny and Steier engaged in wrongdoing related to the Rechnitz payment, the Court finds that "no competent attorney" could make the asserted claims after reviewing the evidence provided. *See O'Malley*, 896 F.2d at 707.

The Court further notes that despite submitting various documents, such as email communications, two online news articles, and the transcript of the Dec. 17, 2020 Conference, it is apparent that Gopal relies almost exclusively on her client's assertions and suppositions, without making reasonable inquiry into the validity of Plaintiff's allegations.

The Second Circuit has noted that "an attorney may not base an allegation solely on a client's representation if it is objectively unreasonable to believe that the representation could support the allegation." *Goldman*, 825 F. App'x at 38.

Plaintiff argues that "when a client presents his or her first-hand knowledge, an attorney may rely upon it." (Pl. Mem. of Law in Opp. at 4-5.)  In support of this proposition, Plaintiff cites to *In re Air Disaster at Lockerbie, Scotland*, 144 F.R.D. 613 (E.D.N.Y. 1992).  However, the court there did not absolve lawyers of their obligation to investigate their own clients' claims.  It stated that parties and their attorneys are "entitled to base their complaints and their requests for discovery on statements of witnesses, reports of their investigators and hearsay reports and statements of others <u>until such time, if ever, as they are satisfied that the statements and other evidence are not competent or are otherwise untrustworthy</u>." *In re Air Disaster*, 144 F.R.D. at 617 (emphasis added).  The defendants/third-party plaintiffs in that case based their complaint, discovery requests and opposition papers on a report and affidavit of two witnesses "and the other related information which [the attorneys] had obtained from other sources." *Id.*  The court declined to impose sanctions, noting in addition that "[i]t ill behooves the Government now to claim that defendants and their lawyers knew or should have known that the [report and affidavit] were false when they have concededly withheld information from them which prove that their report and affidavit were in fact false." *Id.*

Here, Plaintiff does not even provide his own statements through an affidavit signed by him, but rather through counsel's unsworn declaration, in which she essentially adopted his assertions as her own.  Even if Gopal had to rely on Plaintiff's recitation of facts, she was required to "question him thoroughly, not accepting his version of events on faith alone." *Saltz*, 129 F. Supp. 2d at 646 (citation omitted).  "[I]f all the attorney has is [her] client's assurance that facts exist or do not exist, when a reasonable inquiry would reveal otherwise, [she] has not satisfied [her] Rule 11 obligation." *Id.*

(quoting *Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 114 F.R.D. 684, 689 (S.D.N.Y. 1987) (citation omitted)).

Plaintiff claims that Gopal "spoke with individuals who provide[d] first-hand accounts of events related to Plaintiff's claims."  (Pl. Mem. of Law in Opp. at 7.)  However, none of those individuals' names or accounts are included in the filings.

Given the frivolity of Plaintiff's contentions, the lack of evidentiary support for them, and counsel's failure to make a reasonable inquiry into those allegations, a sanction under Rule 11 is appropriate.

### 3.  *The Appropriate Type of Sanctions*

Defendant Husamudeen asks the Court to impose a sanction of attorneys' fees on Plaintiff and his counsel and requests leave to file documents to support those fees.

"Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment; *see also Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 230 (E.D.N.Y. 2002) (imposing $1,000 sanction payable to the court despite party's request for attorneys' fees, stating, "it is clear that sanctions are appropriately awarded only against counsel because it was incumbent upon counsel to conduct a reasonable inquiry before filing the amended complaint and also to withdraw any claims that became unsupportable later.")

"Sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.  Rule 11 "does not attempt to enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances." *Id.*  Factors that a court may consider include "[w]hether the

improper conduct was willful or negligent," "whether it was intended to injure," "what effect it had on the litigation process in time or expense," "whether the responsible person is trained in the law," and "what amount, given the financial resources of the responsible person, is needed to deter that person" from repeating that conduct and to deter others from engaging in similar conduct. *Id.*

According to her online profile, Gopal graduated law school in 2018, was admitted to the New York bar in 2019, worked in Europe from July 2018 until June 2020, and founded her own law firm in 2020, where she is a solo practitioner. (Ex. 4 to Def. Mem. of Law. in Supp. at 148 (ECF pagination), Dkt. 52-2.) The law firm, Muciri Law PLLC, "is a specialist technology law practice working to advance individual freedom in the digital economy by offering people and small businesses, across the world, affordable client-driven legal services to defend against technology-driven wrongs." (*Id.* at 142 (ECF pagination).) Thus, Gopal was just three years out of law school when she began representing Plaintiff and filed the Motion to Disqualify. While junior attorneys are encouraged to take on as much responsibility as they can handle, they must also be mindful that their lack of experience may lead them to exceed the bounds of legal rules and obligations. Certainly, Gopal's zealous advocacy for her client is laudable. *See In re Air Disaster*, 144 F.R.D. at 617 (Rule 11 standard "is not intended 'to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law.'" (citation omitted)). However, a lawyer must not simply do her client's bidding. She must independently research the factual and legal bases for any papers filed with the Court to satisfy her obligation of making "inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). Accusations that adversaries have engaged in wrongdoing, especially criminal malfeasance, should not be made cavalierly without careful consideration of whether they are true. Belief in the righteousness of one's cause is no substitute for facts, which are the bedrock of our legal system.

The Court admonishes Gopal for filing the Motion to Disqualify based on speculation and allegations that are utterly lacking in evidentiary support. Furthermore, in order to deter Gopal and

others from engaging in similar conduct, the Court finds that a fine in the amount of $500 payable to the Court is appropriate. This amount takes into account Gopal's relative inexperience, the minimal evidence that she has engaged in this type of behavior in other cases,[12] and the expectation that this kind of conduct will not be repeated. *See, e.g.*, *Saltz*, 129 F. Supp. 2d at 647 (finding sanction of $200 was appropriate); *Magnotta v. Berry*, No. 91-CV-0531 (DNE), 1996 WL 11238, at *6 (S.D.N.Y. Jan. 5, 1996) ("consider[ing] all of the factors set forth in the advisory committee's note to the 1993 amendments" and finding $1,000 fine was appropriate where, *inter alia*, misrepresentations were substantial and attorney was "a trained lawyer and experienced member of the bar"); *see also Bell v. New York State Teamsters Conf. Pension & Ret. Fund*, No. 86-CV-126, 1987 WL 30307, at *3 (N.D.N.Y. Dec. 28, 1987) (finding attorney's inexperience in particular area of law was a mitigating factor in determining the appropriate amount of attorneys' fees to award due to Rule 11 violation).

The Court declines to impose sanctions against Plaintiff himself. *See, e.g, Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 339 (S.D.N.Y. Mar. 29, 2019); *Gambello*, 186 F. Supp. 2d at 230. It was counsel's obligation to conduct a reasonable inquiry before filing the Motion to Disqualify, and Husamudeen has not offered any reason to impose sanctions on Plaintiff. (Def. Mem. in Supp. at 9-12.)

## B. Sanctions Pursuant to 28 U.S.C § 1927

Under 28 U.S.C § 1927, a district court can impose sanctions on an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." "To impose sanctions under this provision, 'a court must find clear evidence that (1) the offending party's claims were entirely without

---

[12] Defendant argues that Gopal "goes through similar lengths to defame defendants' counsel" in a separate case, *Meehan v. VIPKid*, No. 20-CV-6370 (JS)(AKT) (E.D.N.Y.). (Def. Mem. of Law in Supp. at 11.) However, Defendant points out only that Gopal made allegations that the defendants' counsel was engaged in some form of cover up in that case. Gopal was not sanctioned for making those allegations and, without additional information about the validity of those allegations, the Court cannot conclude that Gopal has engaged in a pattern of similarly sanctionable conduct.

color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay.'" *Kim v. Kimm*, 884 F.3d 98, 106 (2d Cir. 2018) (quoting *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (internal citation and quotation marks omitted)). "A court may infer bad faith when a party undertakes frivolous actions that are 'completely without merit.'" *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 55 (2d Cir. 2018) (quoting *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000) (citation omitted)). Pursuant to § 1927, sanctions may be imposed only on the attorney, not the client. *See Craig*, 380 F. Supp. 3d at 338.

Although Husamudeen states that he is requesting sanctions pursuant to § 1927, he fails to allege which of Gopal's contentions evince bad faith or make any arguments specific to a showing of bad faith. A sanctioned attorney is entitled to "specific notice of the conduct alleged to be sanctionable and the standard by which the conduct will be assessed . . . ." *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir. 1997). While the Court finds many of Gopal's contentions frivolous and warranting sanctions under Rule 11, it does not find that Gopal was "motivated by improper purposes such as harassment or delay." *Kim*, 884 F.3d at 106 (citation omitted). Accordingly, Defendant Husamudeen's Motion for Sanctions pursuant to 28 U.S.C § 1927 is denied.

**C. Sanctions Pursuant to 42 U.S.C § 1988**

"Title 42, section 1988 of the United States Code authorizes district courts to award reasonable attorneys' fees to prevailing parties in proceedings in vindication of civil rights." *Raishevich v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001). When the defendant is the prevailing party "attorneys' fees may be awarded only if the court finds that the plaintiff's claim was 'frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'" *Oliveri*, 803 F.2d at 1272 (quoting *Hughes v. Roe*, 449 U.S. 5, 15 (1980) (citation omitted)).

As this case is ongoing, the substantial rights of the parties have not yet been determined, and Defendant Husamudeen is not a "prevailing party" under 42 U.S.C § 1988. *See, e.g.*, *Hanrahan v.*

*Hampton*, 446 U.S. 754, 757-58 (1980) ("It seems apparent … that Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims.  For only in that event has there been a determination of the 'substantial rights of the parties,' which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney.").

Accordingly, Defendant Husamudeen's Motion for Sanctions pursuant to 42 U.S.C § 1988 is denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, it is hereby:

**ORDERED**, that Plaintiff's Motion to Disqualify Defendant Husamudeen's counsel, Nathanial K. Charny, Esq., is denied; and it is further

**ORDERED**, that Defendant Husamudeen's Motion for Sanctions against Plaintiff is granted under Fed. R. Civ. P. 11, and a sanction of $500 payable to the Court is imposed on Lakshmi Gopal, Esq.  All other grounds for sanctions are denied.[13]

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:   Brooklyn, New York
         June 22, 2022

---

[13] In his Opposition to the Motion for Sanctions, Plaintiff not only argues that the Court should not sanction him and his counsel, but he also requests that the Court impose sanctions on Husamudeen pursuant to 28 U.S.C. § 1927 based on Husamudeen's Motion for Sanctions.  (Pl. Mem. of Law in Opp. at 10-11.)  In addition to improperly making this request in response to Defendant Husamudeen's motion, rather than filing a separate motion, Plaintiff provides no valid arguments for imposing such sanctions, and his request is denied.